[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *In re Application of S. Branch Solar, L.L.C.*, **Slip Opinion No. 2025-Ohio-5679.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-5679

IN RE APPLICATION OF SOUTH BRANCH SOLAR, L.L.C., FOR A CERTIFICATE OF ENVIRONMENTAL COMPATIBILITY AND PUBLIC NEED TO CONSTRUCT A SOLAR-POWERED ELECTRIC-GENERATION FACILITY IN HANCOCK COUNTY, OHIO; BOHN, APPELLANT; POWER SITING BOARD, APPELLEE; SOUTH BRANCH SOLAR, L.L.C., INTERVENING APPELLEE.

[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *In re Application of S. Branch Solar, L.L.C.*, **Slip Opinion No. 2025-Ohio-5679.]**

*Power Siting Board—R.C. 4906.10(A)—Solar-powered electric-generation facility—Application for certificate of environmental compatibility and public need—Board's determinations under R.C. 4906.10(A)(2), (3), and (6) were not unlawful or unreasonable—Board's order granting certificate affirmed.*

(No. 2023-1020—Submitted January 8, 2025—Decided December 24, 2025.)

APPEAL from the Power Siting Board, No. 21-669-EL-BGN.

_____

BRUNNER, J., authored the opinion of the court, which FISCHER, DEWINE, DETERS, HAWKINS, and SHANAHAN, JJ., joined. KENNEDY, C.J., concurred, with an opinion.

**BRUNNER, J.**

{¶ 1} Appellee, the Ohio Power Siting Board, approved the application of intervening appellee, South Branch Solar, L.L.C., for a certificate of environmental compatibility and public need to construct an approximately 130-megawatt[1] solar-powered electric-generation facility in Hancock County ("the project"). Appellant, Travis Bohn, who claims that he lives across the street from and adjacent to the project site, has appealed the board's order granting the certificate. Bohn argues that the board misapplied the statutory criteria, unreasonably weighed the evidence, and decided the case on incomplete information when analyzing local-government and public opposition to the project and the project's impacts on the local economy, the wildlife in the project area, and the community's stormwater and drainage system.

{¶ 2} Because Bohn has not established that the board unlawfully or unreasonably applied the statutory criteria and because the board's determinations were supported by sufficient probative evidence, we affirm the board's order.

## I. OVERVIEW OF THE REGULATORY PROCESS

{¶ 3} The General Assembly has established standards for the construction of major utility facilities[2] in Ohio and delegated to the board the authority to implement those standards. *See* R.C. 4906.03. R.C. 4906.06(A)(6) establishes that

---

1. South Branch initially applied for certification of a 205-megawatt facility, but it modified the application during the certification process.

2. Included within the definition of "major utility facility" is an "[e]lectric generating plant and associated facilities designed for, or capable of, operation at a capacity of fifty megawatts or more." R.C. 4906.01(B)(1)(a).

an applicant seeking a certificate of environmental compatibility and public need to construct a major utility facility must file with the board chairperson an application containing "[s]uch . . . information . . . as the board by rule or order may require." The board is authorized to adopt rules "as are necessary and convenient to implement" R.C. Ch. 4906. R.C 4906.03(C).

## A. Application components

{¶ 4} R.C. 4906.06(A)(1) through (6) explain broadly the information that must be contained in an application, including, among other things, a description of the proposed facility and its location, a summary of the environmental-impact studies performed regarding the facility, and a statement explaining the need for the facility. The board's rules[3] required more specific information, such as an estimate of the economic impact of the facility on local commercial and industrial activities, *see* former Adm.Code 4906-4-06(E)(4), 2015-2016 Ohio Monthly Record 2-1885 (effective Dec. 11, 2015); the results of specific studies related to animal species that may be affected by the facility, *see* former Adm.Code 4906-4-08(B)(1)(c) and (d), 2017-2018 Ohio Monthly Record 2-2998, 2-3000 (effective Apr. 26, 2018); and an analysis of and mitigation plan for potential flooding in the area of the facility, *see* former Adm.Code 4906-4-08(A)(4)(e), 2017-2018 Ohio Monthly Record 2-2998, 2-2999 (effective Apr. 26, 2018). The board is permitted to waive a requirement of its rules so long as the requirement is not mandated by statute. Adm.Code 4906-4-01(B).

{¶ 5} After an application is filed, the board's rules require that within 60 days following receipt, the board chairperson or the chairperson's designee must either accept the application as complete and compliant with the board's rules or

---

3. We will utilize the rules in effect at the time South Branch filed its application. The board has since amended its rules. *See* 2023-2024 Ohio Monthly Record 2-2946 through 2-2994 (effective May 30, 2024).

reject the application as incomplete with a statement explaining the basis of the rejection. Adm.Code 4906-3-06(A)(1) and (A)(2).

## B. Public participation

{¶ 6} Once notice is given from the board chairperson to the applicant that an application is complete, the applicant must, among other tasks, serve copies of the accepted, complete application on the government officials identified in Adm.Code 4906-3-07(A)(1)(a). The board must also schedule a local public hearing. *See* R.C. 4906.07(A). The purpose of the hearing is to allow members of the public to provide sworn testimony about the proposed facility. *See* Ohio Power Siting Board, *Public Participation at the OPSB*, https://opsb.ohio.gov /processes/public-participation (accessed July 17, 2025) [https://perma.cc/FHJ8-P3RK]. The board also accepts informal written comments about a case, which are filed in a public-comment section of the case record. *See id.*

## C. Staff investigation

{¶ 7} Once the board chairperson certifies that an application is complete, the chairperson must direct board staff to investigate the application. *See* R.C. 4906.07(C); Adm.Code 4906-3-06(C). Following its investigation, staff must issue a written report at least 15 days before the public hearing on the application, and the report must describe the nature of the investigation and contain recommended findings with regard to R.C. 4906.10(A). *See* R.C. 4906.07(C); Adm.Code 4906-3-06(C)(1). A copy of the report can be obtained by any person upon request. R.C. 4906.07(C); Adm.Code 4906-3-06(C)(4). The report not only provides the board with recommended findings with regard to R.C. 4906.10(A), but it also provides interested parties with the information and materials necessary to make an informed challenge to the application, *see Duff v. Pub. Util. Comm.*, 56 Ohio St.2d 367, 376 (1978).

**D. The adjudicatory hearing**

{¶ 8} Before the board may issue a certificate for the construction of a major utility facility, it must make eight substantive determinations. R.C. 4906.10(A)(1) through (8). Bohn challenges three of the board's determinations in this appeal. R.C. 4906.10(A) provides:

> The board shall not grant a certificate . . . unless it finds and determines . . .
>
> . . .
>
> (2) The nature of the probable environmental impact;
>
> (3) That the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations;
>
> . . .
>
> (6) That the facility will serve the public interest, convenience, and necessity;
>
> . . . .

{¶ 9} Throughout the certification process, the board has the authority to require an applicant to provide information that "it considers necessary to assist in the conduct of hearings and any investigations or studies it may undertake," R.C. 4906.03(A), and to "[c]onduct any studies or investigations that it considers necessary or appropriate to carry out its responsibilities under [R.C. Ch. 4906]," R.C. 4906.03(B).

**{¶ 10}** The board conducts an adjudicatory hearing on the application, at which the parties[4] may present prefiled testimony, cross-examine witnesses, and develop the evidentiary record that the board will consider in arriving at its decision. *See* Ohio Power Siting Board, *Public Participation at the OPSB*. The board may consider a stipulation entered into by two or more parties that resolves some or all the issues pending before the board, but the stipulation is not binding on the board. Adm.Code 4906-2-24(A) and (D). The board here used a three-part test to evaluate the reasonableness of a stipulation and whether to adopt it, Power Siting Bd. No. 21-669-EL-BGN, ¶ 102 (Feb. 16, 2023), a test we have endorsed as evaluating "'whether the settlement is a product of serious bargaining among capable, knowledgeable parties; whether the settlement, as a package, benefits ratepayers and the public interest; and whether the settlement package violates any important regulatory principles or practices,'" *In re Application of E. Ohio Gas Co.*, 2023-Ohio-3289, ¶ 11, quoting *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 2006-Ohio-4706, ¶ 16. Parties that do not join a stipulation may present arguments and evidence in opposition to it. Adm.Code 4906-2-24(D).

**{¶ 11}** Finally, we have explained that R.C. Ch. 4906 authorizes a "dynamic process," *In re Application of Buckeye Wind, L.L.C.*, 2012-Ohio-878, ¶ 16, which confers authority on the board to impose conditions on the issuance of a certificate so that the board may monitor compliance with those conditions, which could include ensuring the mitigation of potential negative impacts of the project, *see id.*

---

4. R.C. 4906.08(A) provides that "parties to a certification proceeding" include (1) the applicant, (2) each person entitled to receive service of a copy of the application under R.C. 4906.06(B) if the person has timely filed a notice of intervention as a party, and (3) any person residing in a municipal corporation or county entitled to receive service of a copy of the application under R.C. 4906.06(B) and any other person, if the person has timely petitioned the board for leave to intervene as a party and if that petition has been granted by the board for good cause shown.

## II. SOUTH BRANCH'S APPLICATION

{¶ 12} On July 22, 2021, South Branch filed an application with the board for a certificate of environmental compatibility and public need to construct a solar-powered electric-generation facility in Washington Township, Hancock County. The project will consist of rows of solar panels affixed to metal rackings and of associated facilities and equipment, including access roads, electrical-collection lines, inverters, transformers, four meteorological stations, an operations and maintenance building, and a substation. The project will be located on 700 acres of private, mostly agricultural land.[5] On September 20, the board sent South Branch a letter indicating that the application was in compliance with Adm.Code Ch. 4906-01 et seq. and that the board staff had received sufficient information to commence its investigation.

{¶ 13} South Branch served a copy of the application on local-government officials, including the Washington Township Trustees, the Hancock County Board of County Commissioners, the Hancock County engineer, the Hancock Soil and Water Conservation District, and the Hancock Regional Planning Commission. Of these local-government officials, only the county commissioners filed a notice of intervention as a party. Several other nongovernmental parties sought and were granted leave to intervene as parties, including the Ohio Farm Bureau Federation and Bohn.

{¶ 14} The board staff investigated the project and submitted a report on April 11, 2022. The staff's report contained a summary of its investigation and recommendations based on its assessment of the eight substantive determinations set forth in R.C. 4906.10(A) that the board must make. The board staff recommended that a certificate be issued, subject to 50 enumerated conditions.

---

5. The footprint of the project was reduced from approximately 1,000 acres to approximately 700 acres during the certification process.

{¶ 15} On April 27, a local public hearing was held. Eleven people spoke in support of the project, highlighting job creation, the positive economic impacts of the project, and the benefits of solar power in the community. Twenty-six people expressed apprehension or opposition to the project, stressing the importance of preserving agricultural land and raising concerns over potentially negative aesthetics, decrease in property values, noise, ecological impacts, and perceived inefficiencies with solar power. The board also received more than 285 public comments.

{¶ 16} On May 31, a joint stipulation and recommendation was filed, which was intended to resolve all matters relevant to the certification and construction of the project. The stipulation was agreed to by South Branch, board staff, the county commissioners, and the farm bureau. These parties recommended that the board issue a certificate to South Branch, subject to the conditions recommended in the staff report. Bohn did not join the stipulation and continued to oppose the application. On June 1, the board held an adjudicatory hearing on the stipulation.

{¶ 17} On February 16, 2023, the board issued an opinion and order adopting the stipulation and issuing a certificate to South Branch for construction of the project, subject to the conditions set forth in the stipulation. Power Siting Bd. No. 21-669-EL-BGN at ¶ 108, ¶ 137, ¶ 141 (Feb. 16, 2023). After unsuccessfully seeking rehearing, Power Siting Bd. No. 21-669-EL-BGN, ¶ 39 (June 15, 2023), Bohn appealed to this court, raising eight propositions of law. The board filed a brief in defense of its order. We granted South Branch leave to intervene as an appellee, 2023-Ohio-4409, and it urges us to affirm the board's order.

### III. ANALYSIS

### A. Standard of review

{¶ 18} Under R.C. 4906.12, we apply the same standard of review to power-siting determinations that we apply to orders of the Public Utilities Commission.

8

*In re Application of Icebreaker Windpower, Inc.*, 2022-Ohio-2742, ¶ 12, citing *In re Application of Black Fork Wind Energy, L.L.C.*, 2013-Ohio-5478, ¶ 10.  Under this standard, we will reverse, vacate, or modify an order of the board only when, upon consideration of the record, we conclude that the order was unlawful or unreasonable.  R.C. 4903.13.  "We will not reverse or modify a board decision as to questions of fact when the record contains sufficient probative evidence to show that the board's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty."  *In re Application of Champaign Wind, L.L.C.*, 2016-Ohio-1513, ¶ 7.  We review questions of law de novo.  *Icebreaker Windpower* at ¶ 12.

**B.  The board's determinations under R.C. 4606.10(A)(2) and (A)(3) were not unlawful or unreasonable**

{¶ 19} In determining the nature of the project's probable environmental impact under R.C. 4906.10(A)(2) and whether the project, subject to the stipulated conditions, represents the minimum adverse environmental impact under R.C. 4906.10(A)(3), the board explained that it had relied on the experienced staff professionals who thoroughly investigated the application and were familiar with the requirements of R.C. 4906.10.  Power Siting Bd. No. 21-669-EL-BGN at ¶ 107 (Feb. 16, 2023); Power Siting Bd. No. 21-669-EL-BGN at ¶ 34 (June 15, 2023).

{¶ 20} The staff report included the results of groundwater and surface-water studies; information obtained from the Ohio Department of Natural Resources ("ODNR") and the United States Fish and Wildlife Service ("USFWS"), field studies, and published ecological literature regarding the presence of threatened or endangered plant and animal species in the project area; summaries of geological surveys; and information regarding community impacts like aesthetics and noise.  The board noted the staff's conclusion that "while the Project will result in temporary and permanent environmental impacts, those impacts are

unlikely to be significantly adverse such that the Project represents the minimum adverse environmental impact." Power Siting Bd. No. 21-669-EL-BGN at ¶ 73 (Feb. 16, 2023).

{¶ 21} Bohn argues that the board did not require South Branch to provide all the information required by its rules to properly determine the nature of the project's probable impacts on wildlife and flooding under R.C. 4906.10(A)(2) or whether the project represents the minimum adverse environmental impact under R.C. 4906.10(A)(3), rendering its order unlawful and unreasonable. He also argues that despite testimony from local residents regarding flooding in the area of the project site, the board did "virtually nothing" to analyze the impacts of the project on flooding and the local community's drain-tile system.

{¶ 22} For the following reasons, we find that the board acted in accordance with its rules and that its determinations under R.C. 4906.10(A)(2) and (A)(3) were not unreasonable.

### 1. Wildlife

{¶ 23} At the time South Branch filed its application, former Adm.Code 4906-4-08(B)(1) required an applicant to "provide information regarding ecological resources in the project area." 2017-2018 Ohio Monthly Record at 2-3000. Under this rule, South Branch was required to do the following:

> (c) Provide the results of a literature survey of the plant and animal life within at least one-fourth mile of the project area boundary. The literature survey shall include aquatic and terrestrial plant and animal species that are of commercial or recreational value, or species designated as endangered or threatened.

> (d) Conduct and provide the results of field surveys of the

plant and animal species identified in the literature survey.[6]

*Id.*

{¶ 24} Bohn argues in his merit brief that the board failed to require South Branch to "provide the results of a literature survey for *all* wildlife in and near the Project area," including information about bald eagles. (Emphasis in original.) Bohn claims that without the literature searches and corresponding field surveys for wildlife, the board could not determine the nature of the probable environmental impact of the project on wildlife in the area or what would constitute the minimum adverse environmental impact of the project on wildlife in the area.

{¶ 25} While the first sentence of former Adm.Code 4906-4-08(B)(1)(c) required South Branch to "[p]rovide the results of a literature survey of the plant and animal life within at least one-fourth mile of the project area boundary" generally, the rule further explained that the wildlife species that *must* be reported in the survey are those that are "of commercial or recreational value, or species designated as endangered or threatened." *Id.*

{¶ 26} Nothing in the rule required the literature survey to report on each wildlife species that may be found near the project site. In *In re Application of Alamo Solar I, L.L.C.*, 2023-Ohio-3778, ¶ 48, we found that literature surveys that included "specific discussions of all sorts of birds (including raptors such as bald eagles), bats, and aquatic life in and near the project areas" satisfied former Adm.Code 4906-4-08(B)(1)(c). Although the literature survey submitted by South Branch arguably may not have been as robust as the survey provided in *Alamo*, Bohn cannot establish that the board's order was unlawful or unreasonable.

---

6. Adm.Code 4906-4-08(B), 2023-2024 Ohio Monthly Record 2-2972, 2-2974 (effective May 30, 2024), still requires an applicant to "provide information on ecological resources." However, Adm.Code 4906-4-08(B) specifies that the information that was required to be included under former Adm.Code 4906-4-08(B)(1)(a) through (e) now serves as "[e]xamples of relevant information," 2023-2024 Ohio Monthly Record at 2-2974.

**{¶ 27}** A wildlife-literature survey is a component of an application, but it is not the only information the board receives about the potential ecological impacts of a project. For example, at the adjudicatory hearing, the board heard testimony from South Branch's experts, including Lynn Gresock, a consultant with over 37 years of experience providing environmental permitting and compliance services. Gresock managed or coordinated the environmental and cultural surveys that were completed for the project. She explained that based on her environmental consulting company's research, the wildlife species that use the project area are those typically found in Ohio agricultural fields, such as turkey vultures, Canada geese, American robins, woodchucks, and eastern grey squirrels. Gresock concluded that there is abundant availability of similar agricultural fields within and near the project area that common species can use as similar habitats and that the solar project will therefore not eliminate habitats for those common species. She also explained that after construction is complete, the project area will be stabilized with permanent vegetation, which provides a more consistent habitat for birds and other wildlife species compared to farm fields with rows of crops.

**{¶ 28}** Board staff also conducted its own field assessments and reviewed published ecological information for the project area and concluded that other than potential impacts to certain bat species, the project would not impact any other threatened or endangered wildlife species. Staff further concluded that South Branch's vegetation-management plan will likely *enrich* the local wildlife habitat.

**{¶ 29}** Bohn argues that bald eagles are a particular wildlife species that the board failed to consider when evaluating the project's probable environmental impact and whether the project represents the minimum adverse environmental impact. Bohn's argument is premised on his belief that "evidence filed in this case clearly shows a number of bald eagles present in the Project area." Bohn acknowledges that the board heard public-hearing testimony of residents who had seen bald eagles nesting on their property or flying near the project site. The board

also heard expert testimony at the adjudicatory hearing about the project's potential impacts on bald eagles. Gresock testified that in 2020, ODNR identified 12 bald-eagle nests in Hancock County but that none of those nests were in proximity to the project area, the project area was not considered to have a strong nesting habitat potential for bald eagles, and no bald eagles were observed during her company's field survey of the project area.

{¶ 30} Contrary to Bohn's assertion, the board considered the impact of the project on bald eagles. It concluded that at the time South Branch filed its application, the bald eagle was not listed as endangered or threatened by USFWS or ODNR, and it determined that the record evidence supported a finding that the nature of the ecological impact of the project was properly evaluated under R.C. 4906.10(A)(2) and that the project represents the minimum adverse environmental impact under R.C. 4906.10(A)(3). Power Siting Bd. No. 21-669-EL-BGN at ¶ 26 (June 15, 2023). Moreover, R.C. 4901.10(A)(3) "does not require the elimination of all adverse impacts," *Alamo Solar*, 2023-Ohio-3778, at ¶ 43.

{¶ 31} Bohn also attempts to argue that the bald eagle is a species of "recreational value" and because the second sentence of former Adm.Code 4906-4-08(B)(1)(c), 2017-2018 Ohio Monthly Record at 2-3000, required South Branch's literature survey to identify animal species of "recreational value," South Branch violated the rule by omitting bald eagles from its survey. However, Bohn did not preserve this argument in his application for rehearing and is therefore jurisdictionally barred from raising it on appeal, *see* R.C. 4903.10(B); *In re Letter of Notification Application of Columbia Gas of Ohio, Inc.*, 2024-Ohio-4747, ¶ 16. Moreover, Bohn did not present any evidence to support finding that bald eagles are a species of recreational value.

{¶ 32} Because sufficient probative evidence supported the board's determination of the project's probable impact to wildlife as well as the board's determination that the project represents the minimum adverse environmental

impact, it was not unreasonable. It is the board's duty to ascertain what information is necessary to carry out its responsibilities. *See* R.C. 4906.03(A) and (B). At the same time, the board may waive a requirement contained in its rules so long as it is not mandated by statute. Adm.Code 4906-4-01(B). Bohn does not point to any statute that requires an applicant to provide literature-survey results that document every wildlife species found near a project site. Therefore, the board's failure to require South Branch to provide results of a literature survey of *all* wildlife species in and near the project area was not unlawful. *See Alamo Solar* at ¶ 47-48.

{¶ 33} Finally, even if the board failed to consider the impacts of the project on *all* wildlife species that may be found near the project site, including bald eagles, Bohn has not explained how any alleged error committed by the board resulted in harm. *See In re Black Fork Wind Energy, L.L.C.*, 2018-Ohio-5206, ¶ 25 (finding harm when the "appellants have shown a realistic possibility of a different outcome but for the board's error"). Bohn has left us to speculate only about the harm that might be caused by the board's failure to require more robust wildlife surveys. This court "will not reverse a [board] order based on speculation." *In re Application of Ohio Power Co.*, 2018-Ohio-4698, ¶ 50.

### 2. Drainage and flooding issues

{¶ 34} Former Adm.Code 4906-4-08(A)(4)(e) required South Branch to "[p]rovide an analysis of the prospects of floods for the area, including the probability of occurrences and likely consequences of various flood stages, and describe plans to mitigate any likely adverse consequences." 2017-2018 Ohio Monthly Record at 2-2999. Bohn argues that South Branch did not submit the information required by this rule and that the board erred in determining the nature of the probable environmental impact of the project under R.C. 4906.10(A)(2) and that the project represents the minimum adverse environmental impact under R.C. 4906.10(A)(3).

14

{¶ 35} Contrary to Bohn's assertion, South Branch's application and amended application provided an analysis of the prospects of floods in the area and described plans to mitigate related adverse consequences.  South Branch stated in its application that no portion of the project area was included in a floodplain or flood hazard and therefore the project was not expected to increase the potential for flooding.   It also submitted a stormwater-management report prepared by Westwood Professional Services, which concluded that when the project is operational, it will not alter existing flow and drainage patterns.  Westwood also found that because the land under the solar panels will be filled with vegetation (as opposed to row crops), runoff rates in most drainage areas will be *reduced* after the project is operational.

{¶ 36} To mitigate concerns about the potential for flooding, South Branch committed to obtaining and implementing stormwater controls required by the Ohio Environmental Protection Agency's "General Permit Authorization for Storm Water Discharges Associated with Construction Activity."   South Branch also submitted a drain-tile-mitigation plan, which included a commitment to locating existing drain tiles[7] in the project area, implementing drain-tile-avoidance measures, repairing any drain tiles damaged during construction, and retaining a local drain-tile expert to survey potential low-lying areas where ponding could occur in the event drain tiles are damaged.

{¶ 37} Contrary to Bohn's contention, South Branch's application and amended application provided an analysis of the prospects of floods in the area and described plans to mitigate adverse consequences.   Therefore, South Branch complied with former Adm.Code 4906-4-08(A)(4)(e).

---

7. Although the parties have not defined the term "drain tile," it is generally known that "[a] tile is a tube or pipe used to drain land," *State ex rel. Wasserman v. Fremont*, 2014-Ohio-2962, ¶ 3 (lead opinion); *see also Webster's Third New International Dictionary* (2002) (defining "tile" as a pipe "laying out underground . . . to drain fields").

**{¶ 38}** Bohn also argues that the board improperly issued a certificate without requiring South Branch to "legitimately and significantly evaluate information related to flooding in the area" and therefore "violate[d] the Board's duties" under R.C. 4906.10(A)(2) and (A)(3). The record, however, does not support these arguments.

**{¶ 39}** In addition to the information provided in the application, the stipulation included two conditions designed to mitigate potential flooding risks. The board recognized that the project area occasionally floods but concluded that South Branch had implemented adequate mitigation plans relating to stormwater runoff, flooding, and drain tiles. Power Siting Bd. No. 21-669-EL-BGN at ¶ 28-29 (June 15, 2023). South Branch also committed to avoid damaging drain tiles as much as possible, promptly repairing damaged tiles, and implementing a complaint-resolution procedure during construction and operation of the project.

**{¶ 40}** Therefore, the board did not act unlawfully or unreasonably in determining the nature of the project's probable impacts on flooding and drainage to the project area or in determining that the project represents the minimum adverse environmental impact.

### 3. Setbacks

**{¶ 41}** After the adjudicatory hearing but before the board issued its final order, South Branch filed a notice indicating that it had incorporated the setback distances that the board had approved in a different power-siting case, *In re Application of Harvey Solar I, L.L.C.*, Power Siting Bd. No. 21-164-EL-BGN, and that the board had proposed in its rules. Under the modification, South Branch committed to increasing the minimum setbacks from its solar panels to the following:

- 300 feet from a nonparticipating residence;
- 150 feet from a public road; and
- 50 feet from a nonparticipating property line.

The board rejected Bohn's argument that the project's increased setbacks were not appropriate. Power Siting Bd. No. 21-669-EL-BGN at ¶ 21-23 (June 15, 2023).

{¶ 42} Bohn argues that the setbacks are unreasonable because they "offer no meaningful isolation from the Project's harmful impacts." Bohn identifies only one purported harmful impact—the visibility of the project. He claims that the solar panels and fencing will be visible from neighbors' homes, expose neighbors to unpleasant views for at least 35 years, and "ruin the scenic, rural quality of the area."

{¶ 43} The board's statutory obligation under R.C. 4906.10(A)(3), however, was to determine that the proposed facility "represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations." South Branch is not required to ensure that the solar panels will be invisible or completely screened off from a neighbor's property.

{¶ 44} Moreover, the record contained sufficient probative evidence of the mitigating measures that South Branch will implement to soften unsightly views from nonparticipating residences, including (1) preparing a landscape plan in consultation with a licensed landscape architect that addresses the aesthetic impacts of the project with an emphasis on any nonparticipating residence with a direct line of sight to the project, (2) ensuring that the plan incorporates planting-design features to address aesthetic impacts to the traveling public and nearby communities, (3) maintaining the vegetative screening for the life of the project and replacing any failed plantings so that after five years, at least 90 percent of the vegetation has survived, and (4) submitting the landscape plan to the board staff for confirmation that it complies with the stipulation. The board approved the project's increased setbacks in conjunction with the landscaping requirements and the other mitigating measures that are intended to minimize the visual impact of the project

on surrounding residences. Power Siting Bd. No. 21-669-EL-BGN at ¶ 108 (Feb. 16, 2023).

{¶ 45} Whether setbacks are sufficient to protect the public is an evidentiary issue, and this court will not substitute its judgment for the board on evidentiary matters. *See In re Application of Champaign Wind, L.L.C.*, 2016-Ohio-1513, ¶ 30. Bohn has not cited any contrary evidence indicating that the 300-foot setback from nonparticipating residences coupled with the landscaping plan is insufficient to minimize adverse visual impacts of the project. The board's findings regarding the visual impacts of the project under R.C. 4906.10(A)(3) were supported by sufficient and probative evidence in the record.

{¶ 46} Bohn also argues that the board acted unlawfully by approving the increased setbacks that are similar to the ones approved in *Harvey Solar*; in Bohn's view, the board's approach "does not account for the unique challenges facing the residents of the Village of Arcadia and Washington Township." But Bohn has not identified those unique challenges or further explained the basis for his argument as to why it was unlawful for the board to apply uniform setbacks across different solar projects. Bohn bears the burden of demonstrating reversible error, which must be supported by more than conclusory statements. *In re Complaint of Toliver v. Vectren Energy Delivery of Ohio, Inc.*, 2015-Ohio-5055, ¶ 30 ("Unsupported legal conclusions do not demonstrate error.").

## C. The board's determination under R.C. 4606.10(A)(6) was not unlawful or unreasonable

{¶ 47} In determining whether the project will serve the "public interest, convenience, and necessity" under R.C. 4906.10(A)(6), the board adopted its staff's findings and recommendations, as modified by the stipulation, and noted that it had relied on the experienced staff professionals who thoroughly investigated the application and were familiar with the requirements of R.C. 4906.10. Power Siting Bd. No. 21-669-EL-BGN at ¶ 107 (Feb. 16, 2023); Power Siting Bd. No. 21-669-

EL-BGN at ¶ 34 (June 15, 2023). The board found that the county commissioners' joinder in the stipulation was "strong evidence" of the project's beneficial impacts to the local community. Power Siting Bd. No. 21-669-EL-BGN at ¶ 107 (Feb. 16, 2023). The board concluded that several conditions contained in the stipulation were "enhanced to further the public interest as a result of the negotiation process." *Id.* at ¶ 106. The board also identified specific benefits of the project, such as the "generation of zero emission energy, increases in local revenues, including the local school district, and enhancements to the state and local economy." Power Siting Bd. No. 21-669-EL-BGN at ¶ 34 (June 15, 2023).

{¶ 48} Bohn argues that the board improperly weighed the evidence concerning local-government input and public opinion regarding the project, determined the economic impacts of the project based on incomplete and "one-sided" information, and accepted unreasonable setbacks proposed by South Branch.

*1. Local-government and public opposition*

{¶ 49} In Bohn's view, had the board properly considered the local-government and public opposition to the project, it would not have determined that the project will serve the "public interest, convenience, and necessity" under R.C. 4906.10(A)(6). Bohn argues that the board gave too much weight to the position of the county commissioners while discounting other governmental officials who voiced opposition. What Bohn is asking us to do is reweigh the evidence and find that the opposition testimony of two township trustees at the public hearing and public comments filed by the township fiscal officer and the county public-health director outweigh any benefits of the project that were explained by experts and supported by data submitted during the certification process. Reweighing evidence is beyond the scope of our review. *See In re Complaints of Lycourt-Donovan v. Columbia Gas of Ohio, Inc.*, 2017-Ohio-7566, ¶ 35.

{¶ 50} We find that the board's determination was sufficiently supported by probative evidence in the record. At the outset, we note that contrary to Bohn's

argument, the board's opinion is not misleading on the description of the public input it received. The information obtained throughout the public-hearing and public-comment processes included both support and opposition for the project, which the board in its opinion thoroughly explained. Power Siting Bd. No. 21-669-EL-BGN at ¶ 37-43 (Feb. 16, 2023).

{¶ 51} Bohn was the only party who formally intervened and opposed the project at the adjudicatory hearing and on appeal. South Branch, board staff, the county commissioners, and the farm bureau agreed and stipulated that the project would serve the "public interest, convenience, and necessity" under R.C. 4906.10(A)(6). It was not improper for the board to give significant weight to the stipulation, which was the product of serious bargaining between the parties[8] and was supported by expert testimony and data.

{¶ 52} Moreover, while local-government and public input regarding the project are informative, they are not determinative of whether the proposed facility will serve the "public interest, convenience, and necessity" under R.C. 4906.10(A)(6). As discussed in the following section, the board also considered the economic impacts of the project to be a "net positive" for the community. Power Siting Bd. No. 21-669-EL-BGN at ¶ 20 (June 15, 2023).

*2. Economic impacts*

{¶ 53} Former Adm.Code 4906-4-06(E)[9] required South Branch to include in its application "information regarding the economic impact of the project." 2015-2016 Ohio Monthly Record at 2-1885. Specifically, division (E)(1) required

---

8. South Branch claims that Bohn did not respond to invitations to participate in the discussions leading to the stipulation.

9. Adm.Code 4906-4-06(D), 2023-2024 Ohio Monthly Record 2-2968, 2-2969 (effective May 30, 2024), still requires an applicant to "provide information regarding the economic impact of the project." However, Adm.Code 4906-4-06(D) specifies that the information that was required to be included under former Adm.Code 4906-4-08(E)(1) through (4) now serves as "[e]xamples of relevant economic impact information," 2023-2024 Ohio Monthly Record at 2-2969.

an estimate of the value of the project's payroll, division (E)(2) required an estimate of how many people will be employed during construction and operation of the project, division (E)(3) required an estimate of the increase in local-tax revenue accruing from the project, and division (E)(4) required "an estimate of the economic impact of the proposed facility on local commercial and industrial activities." *Id.* Bohn argues that the board did not require South Branch to provide information about potential *negative* economic impacts of the project, such as potential losses to local businesses and from converting agricultural land to a solar facility. In Bohn's view, the board's analysis was unreasonable and unlawful because it did not ensure compliance with former Adm.Code 4906-4-06(E)(4) and was based on incomplete information.

{¶ 54} But Bohn does not point to any statute or rule that explicitly requires an applicant to provide an analysis of any one specific *negative* impact of a major utility facility on local businesses or industries, and we recently rejected such an interpretation of former Adm.Code 4906-4-06(E)(4), *see In re Application of Firelands Wind, L.L.C.*, 2023-Ohio-2555, ¶ 58 (finding the rule did not require the applicant "to specifically quantify potential losses to tourism, farmers, or other energy providers"). Instead, we concluded that the rule required only that the applicant "provide an estimate of the economic impact on local commercial and industrial activities." *Id.*

{¶ 55} South Branch provided what the rule required, an *estimate*, which included consideration of some potentially negative impacts. South Branch submitted with its application and amended application an economic-impact study prepared by the Ohio University Voinovich School of Leadership and Public Affairs, which used the National Renewable Energy Laboratory's "Jobs and Economic Development Impact" model. The researchers estimated that construction of the project would create 294 full-time direct positions and that indirect and induced impacts of the project would support another 463 jobs in

Ohio—with a total economic output of $125.2 million. The researchers estimated that when the project becomes operational, it will directly employ six full-time employees and indirect and induced impacts would support five additional jobs in Ohio—with a total annual economic output of $3.9 million.

{¶ 56} In addition to the economic study that was investigated and reviewed by board staff, South Branch also provided testimony from Erin C. Bowen, a senior manager for CohnReznick, L.L.P., who specialized in property-value impact studies. Bowen looked at the home sales occurring near another solar project in Ohio and found that the home sales in the vicinity of that project occurred during a normal marketing time of 30 to 90 days on market and sold for prices from 2.2 percent below list price to 12.6 percent above list price. Based on studies performed in other states, Bowen concluded that no consistent and measurable negative impacts to home values have been found to have occurred that could be attributed to proximity to the adjacent, commercial-scale, solar-energy use.

{¶ 57} Bohn argues that the board lacked information about the potential economic losses that may occur because the project will be located on land that will no longer be used for agricultural purposes. He also argues that the project will restrict positive economic growth in the Village of Arcadia. But the board heard public testimony of purported negative economic impacts of the project and found them to be collectively "unsubstantiated layperson testimony." Power Siting Bd. No. 21-669-EL-BGN at ¶ 20 (June 15, 2023). Bohn had access to the application for over ten months and the staff report for almost two months before the adjudicatory hearing. He had notice of what economic impacts were being evaluated, and he could have submitted his own evidence to refute South Branch's application or bolster his claims. As it stands, Bohn's claims about the negative impacts of the project are unsubstantiated theories.

{¶ 58} The board explained that it evaluated the net economic impact of the project from a broad perspective and that the record evidence supported a finding

"of the net positive economic impact of the Project." *Id.* Further, the estimate of the economic impacts of the project on local commercial and industrial activities in the application is a subset of information about the overall economic impacts the board considers in evaluating whether the project will serve the "public interest, convenience, and necessity" under R.C. 4906.10(A)(6). *See* former Adm.Code 4906-4-06(E)(1) through (4), 2015-2016 Ohio Monthly Record at 2-1885. Bohn cannot establish that the board acted unlawfully or unreasonably in considering the economic impacts of the project.

### 3. Setbacks

{¶ 59} Bohn argues that the modified setbacks discussed above are also unreasonable because they do not serve the "public interest, convenience, and necessity" under R.C. 4906.10(A)(6). But Bohn does not develop this argument beyond this cursory statement and therefore has failed to demonstrate error. *See Toliver*, 2015-Ohio-5055, at ¶ 30.

### 4. Conclusion

{¶ 60} For the reasons discussed above, the board's determination that the project will serve the "public interest, convenience, and necessity" under R.C. 4906.10(A)(6) was not unlawful or unreasonable.

**D. The board's approval of the stipulation was not unlawful or unreasonable**

{¶ 61} Bohn argues that the board acted unlawfully and unreasonably when it found that the stipulation satisfied two parts of the three-part test for evaluating the reasonableness of a stipulation. *See E. Ohio Gas Co.*, 2023-Ohio-3289, at ¶ 11. First, he argues that the stipulation was not in the public interest for all the reasons we have addressed regarding R.C. 4906.10(A)(2), (3), and (6). But the board did consider evidence in the record, contrary to what Bohn argues. *See* Power Siting Bd. No. 21-669-EL-BGN at ¶ 36-93 (Feb. 16, 2023). The board considered the arguments and evidence presented by Bohn, *see id.* at ¶ 98-99, 104, as well as opposition evidence from the public hearing and the public comments, *see id.* at

¶ 37-40, 42. Ultimately, the board gave more weight to the evidence presented by South Branch and to the findings of board staff following its investigation.

{¶ 62} Second, Bohn argues that the project did not comply with the regulations and statutes governing the certification process and that the stipulation failed to cure those deficiencies. However, we have already explained that Bohn has not established a violation of a statute or administrative rule. Therefore, he cannot establish that the board erred in concluding that the stipulation was the result of a process that "did not violate any important regulatory princip[le] or practice," *id.* at ¶ 107.

{¶ 63} We find no error in the board's approval of the stipulation between South Branch, board staff, the county commissioners, and the farm bureau.

### E. The board complied with R.C. 4903.09

{¶ 64} Under R.C. 4903.09, which applies to the board pursuant to R.C. 4906.12, the board must file "findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based upon said findings of fact." The purpose of the statute is to provide the court with "enough information to know how the [board] reached its result." *In re Application of FirstEnergy Advisors for Certification as a Competitive Retail Elec. Serv. Power Broker & Aggregator*, 2021-Ohio-3630, ¶ 21. "The 'statute requires the [board] to set forth the reasons for its decisions and prohibits summary rulings and conclusions that do not develop the supporting rationale or record.'" *Id.*, quoting *In re Application of Ohio Power Co.*, 2018-Ohio-4698, ¶ 24.

{¶ 65} Bohn argues that the board failed to identify the facts and reasoning "supporting many of its conclusions." But other than relying on his arguments that we have already addressed above, Bohn has not specifically identified which of the board's conclusions lack the detail required by R.C. 4903.09 or amount to a summary ruling. Bohn has the burden of demonstrating reversible error on appeal,

*Toliver*, 2015-Ohio-5055, at ¶ 30, but he has not succeeded in satisfying that burden here.

{¶ 66} Moreover, the board's 58-page order granting the certificate to South Branch—subject to 50 conditions—included findings of fact and conclusions of law. Power Siting Bd. No. 21-669-EL-BGN at ¶ 109-137 (Feb. 16, 2023). The board's order specifically adopted the staff's findings as modified by the stipulation. *Id.* at ¶ 107. It also included lengthy sections summarizing the evidence, *id.* at ¶ 36-93, and a section analyzing the reasonableness of the joint stipulation under the three-part test that this court has previously endorsed, *id.* at ¶ 102-108. We find that the board in its order set forth sufficient reasons for its decision.

## IV. CONCLUSION

{¶ 67} For the foregoing reasons, we affirm the board's order granting the certificate to South Branch.

Order affirmed.

_____

**KENNEDY, C.J., concurring.**

{¶ 68} I concur in the majority opinion. I write separately to discuss in more detail what exactly an applicant must provide to appellee, the Ohio Power Siting Board, to meet its burden in order for the board to issue a certificate of environmental compatibility and public need to construct a solar-powered electric-generation facility.

{¶ 69} Former Adm.Code 4906-4-06(E)(4) required intervening appellee, South Branch Solar, L.L.C., to "provide an estimate of the economic impact of [its] proposed facility on local commercial and industrial activities," 2015-2016 Ohio Monthly Record 2-1885 (effective Dec. 11, 2015). I agree with the majority that this provision does not "explicitly require[] . . . an analysis of any one specific *negative* impact" (emphasis in original), majority opinion, ¶ 54. The provision

gives the board some flexibility in choosing what data an applicant must provide. Still, the provision's language is clear, and it would be nonsensical to conclude that an estimate could be provided without an assessment of both the positive and negative economic impacts of the proposed facility.

{¶ 70} An "estimate" is "the act of appraising or valuing." *Webster's Third New International Dictionary* (2002). An accurate appraisal cannot ignore downsides, including by refusing to determine whether downsides exist. While it is likely impossible to turn over every proverbial stone while on the hunt for negative economic data, the board must, at minimum, require an applicant to check for such economic data in the most likely places. "[T]he board cannot properly evaluate what is in the public's interest without evidence of positive *and* negative economic impacts." (Emphasis added.) *In re Application of Harvey Solar I, L.L.C.*, 2025-Ohio-1503, ¶ 81 (Kennedy, C.J., concurring in judgment only).

{¶ 71} Of course, what exactly the board must require of an individual applicant will be as variable as the communities in which applicants propose to build their facilities. An assessment of the economic impact of a proposed facility on a farming community would likely require different considerations than a similar assessment on a beach resort, a college town, an urban-metropolitan area, a fast-growing suburb, an old mining settlement, or an industrial boomtown. But it would be intellectually dishonest to say that former Adm.Code 4906-4-06(E)(4) required anything less than an honest estimate of the expected economic impact of the proposed facility on the local economy, which necessarily includes potential harms.

{¶ 72} Because South Branch presented evidence showing a range of economic impacts of its proposed solar-powered electric-generation facility, including list-to-sale price adjustments of 2.2 percent below list price to 12.6 percent above list price on home sales in the vicinity of another solar facility in Ohio, I concur in the majority opinion.

_____

26

Travis Bohn, pro se.

Dave Yost, Attorney General, and John H. Jones, Thomas Lindgren, Rhiannon Howard, and Janet Gregory, Assistant Attorneys General, for appellee.

Bricker Graydon, L.L.P., Sommer L. Sheely, and Dylan F. Borchers, for intervening appellee.

_____