[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Application of Oak Run Solar Project, L.L.C.*, Slip Opinion No. 2026-Ohio-1849.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-1849

IN RE APPLICATION OF OAK RUN SOLAR PROJECT, L.L.C., FOR A CERTIFICATE OF ENVIRONMENTAL COMPATIBILITY AND PUBLIC NEED TO CONSTRUCT A SOLAR-POWERED ELECTRIC-GENERATION FACILITY IN MADISON COUNTY, OHIO; MADISON COUNTY BOARD OF COMMISSIONERS ET AL., APPELLANTS; POWER SITING BOARD, APPELLEE; OAK RUN SOLAR PROJECT, L.L.C., INTERVENING APPELLEE.

*Public utilities—Certificate of construction for solar farm—R.C. 4906.10(A)— Adm.Code 4906-4-08(D)(4)(e)—Ohio Power Siting Board did not obtain from applicant seeking certificate to construct solar farm photographic simulations or artist's pictorial sketches of substations for the proposed project, which the board needed to adequately assess the proposed project from public vantage points under Adm.Code 4906-4-08(D)(4)(e) and to make the substantive statutory determinations regarding the visual impacts*

*of the proposed project under R.C. 4906.10(A)—Orders affirmed in part and reversed in part and matter remanded.*

(No. 2024-1477—Submitted October 28, 2025—Decided May 26, 2026.)

APPEAL from the Power Siting Board, Nos. 22-549-EL-BGN and

22-550-EL-BTX.

_____

FISCHER, J., authored the opinion announcing the judgment of the court, which DEWINE and DETERS, JJ., joined. KENNEDY, C.J., concurred in part and dissented in part, with an opinion. BRUNNER, J., concurred in part and dissented in part, with an opinion. HAWKINS, J., concurred in part and dissented in part, with an opinion joined by KENNEDY, C.J., and SHANAHAN, J.

**FISCHER, J.**

{¶ 1} Appellee, the Ohio Power Siting Board, authorized intervening appellee, Oak Run Solar Project, L.L.C., to construct a solar farm in Madison County. The project's opponents and appellants here, the Board of Trustees for Somerford Township, the Board of Trustees for Deercreek Township, the Board for Trustees for Monroe Township, and the Madison County Board of Commissioners (collectively, "the local governments")—have appealed the board's opinion and order granting that authorization, as well as the board's order denying their application for rehearing.

{¶ 2} The crux of their argument is that the board failed to obtain the information necessary to engage in reasoned decision-making about whether to approve various aspects of the project. The local governments are right in one respect: the board did not obtain adequate visual simulations or sketches of the proposed facility. The local governments' remaining arguments fail either on the merits or because they do not show prejudice from the board's orders.

**{¶ 3}** We accordingly affirm in part and reverse in part the board's orders, and we remand this matter to the board with instructions to more thoroughly address the project's visual impacts.

## I. BACKGROUND

### A. Legal background

**{¶ 4}** The General Assembly has vested the board with the authority to approve the construction of a "major utility facility." R.C. 4906.10(A); *see also* R.C. 4906.01(B)(1) (defining "major utility facility"); R.C. 4906.04 ("No person shall commence to construct a major utility facility in this state without first having obtained a certificate for the facility."). There is no dispute that, as the board found, Oak Run's proposed solar farm in Madison County qualifies as a major utility facility.

**{¶ 5}** Before the board can approve the construction of a major utility facility, however, "it must make eight substantive determinations," *In re Application of Harvey Solar I, L.L.C.*, 2025-Ohio-1503, ¶ 10, as set forth in R.C. 4906.10(A). At issue here is whether the board's findings support its order with regard to the following four substantive determinations under R.C. 4906.10(A):

> (2) The nature of the probable environmental impact;
>
> (3) That the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives, and other pertinent considerations;
>
> . . .
>
> (5) That the facility will comply with [R.C. Ch. 3704, 3734, and 6111] and all rules and standards adopted under those chapters . . . ; [and]

(6) That the facility will serve the public interest, convenience, and necessity; . . . .

{¶ 6} The board has adopted "rules as are necessary and convenient to implement" R.C. Ch. 4906. R.C. 4906.03(C). The board's rules that are at issue in this case are discussed below.[1]

### B. Factual background

{¶ 7} In September 2022, Oak Run applied to the board for approval to develop, construct, and operate a solar farm in Madison County. The board granted the local governments' motions to intervene in the case, as well as the motions to intervene of several other parties, including Dr. John Boeckl and the Ohio Environmental Council ("OEC"), both of whom filed amicus briefs in this appeal.

{¶ 8} The board's staff submitted a report summarizing its investigation of the project, with findings and recommendations for the board's consideration. Oak Run and some of the intervenors (including Dr. Boeckl and OEC) then filed a joint stipulation, recommending that the board approve the project, subject to 46 conditions.

{¶ 9} The board held a hearing on the stipulation; it heard evidence supporting and opposing the project, after which it issued a decision amending the stipulation and approving the project, subject to the conditions in the amended stipulation. 2024 WL 1465954, *82 (Mar. 21, 2024). It determined that the project, as approved, satisfied the eight requirements of R.C. 4906.10(A). *Id.* at *81.

{¶ 10} The facility will sit on about 4,400 acres of privately owned land within an approximate 6,050-acre project area. Oak Run procured the land by

---

1. Effective May 30, 2024, after it issued its opinion and order in this case, the board amended and renumbered some of its rules. There is no dispute that the pre-amendment versions of the rules govern here, and each rule citation in this opinion is to the pre-amendment version. The first citation to each rule identifies the effective date of the applied version. And each subsequent citation to the same rule is to that prior version.

executing agreements with the landowners. The facility will include an 800 megawatt ("MW") solar-powered electric-generating facility, a 300 MW alternating-current battery-energy storage system ("BESS") comprised of two 150 MW facilities, and two 3.45-mile-long transmission lines.

{¶ 11} Rows of solar panels will be secured to the ground and "grouped in large clusters that will be fenced with gated entrances." Oak Run will site the panels as part of an "agrivoltaics program," whereby agricultural products will grow and livestock will graze between the rows of panels. The purpose of an agrivoltaics program is to harness the dual-use capabilities of land—that is, to preserve the agricultural productivity of the land while simultaneously using the land as a solar farm to generate renewable energy. Other features of the facility include a seven-foot-tall perimeter fence, access roads, two operations-and-maintenance buildings, underground electric-collection lines, weather stations, inverters, transformers, and collector substations.

{¶ 12} The board denied the local governments' rehearing application, 2024 WL 4039785, *1, 10 (Aug. 22, 2024), and the local governments filed this appeal. We granted Oak Run's application to intervene as an appellee. 2024-Ohio-5878.

## II. ANALYSIS

{¶ 13} This court may reverse, vacate, or modify a final board order "if, upon consideration of the record," we conclude that the "order was unlawful or unreasonable." R.C. 4903.13; *see also* R.C. 4906.12. The "unlawful" part of this standard of review refers to our review of legal questions, "such as the proper interpretation of a statute or whether the board followed its own administrative rules." *Harvey Solar*, 2025-Ohio-1503, at ¶ 12. Whether an order is "unlawful" is a legal question, subject to de novo review. *Id.*, citing *In re Application of Alamo Solar I, L.L.C.*, 2023-Ohio-3778, ¶ 11.

{¶ 14} The "unreasonable" part of the standard applies to the "board's determinations under R.C. 4906.10(A), which requires the board to determine a

project's compliance with broad statutory criteria." *Id.* at ¶ 13, citing *In re Application of Firelands Wind, L.L.C.*, 2023-Ohio-2555, ¶ 14-15. The "open-textured nature of the terms" within those statutory criteria afford the board "a degree of discretion" in its decision-making. *Firelands Wind* at ¶ 15. We review the board's exercise of that discretion for reasonableness. *See Alamo Solar* at ¶ 16; *Firelands Wind* at ¶ 15.

{¶ 15} A board decision is "unreasonable when the evidence clearly does not support it or when [the] decision is internally inconsistent." *Alamo Solar* at ¶ 16, citing *Firelands Wind* at ¶ 15. "We do not reweigh the evidence or second-guess the board on questions of fact" when determining whether its order is unreasonable. (Cleaned up.) *Firelands Wind* at ¶ 17. Nor do we decide whether a board order is wise as a matter of public policy. *See Harvey Solar* at ¶ 3 ("Overarching public-policy questions about the general societal value of commercial solar farms are the province of the General Assembly, not this court.").

*A. Whether the board obtained the required visual-impact information to assess the project's effect on the neighborhood viewshed*

{¶ 16} In their first proposition of law, the local governments contend that the board erred in approving the Oak Run solar-farm project because Oak Run failed to take steps to minimize adverse visual impacts as required by Adm.Code 4906-4-08(D)(4)(f), 2017-2018 Ohio Monthly Record 2-2998, 2-3002 (effective Apr. 26, 2018). In their view, because mitigation measures have not been put in place, residents and passersby will have no means to escape the project's "unpleasant appearance." The local governments maintain that by failing to require Oak Run to implement effective mitigation of the facility's visual impacts, the board did not find and determine that the conditions for approving the facility were met under R.C. 4906.10(A)(3) ("the facility represents the minimum adverse environmental impact") and (A)(6) ("the facility will serve the public interest, convenience, and necessity").

{¶ 17} Adm.Code 4906-4-08(D)(4)(f) provides that an applicant must "[d]escribe measures that will be taken to minimize any adverse visual impacts created by the facility, including . . . visual screening." The local governments fault Oak Run for not including a "vegetative screening plan" in its application and for failing to complete a comprehensive outreach to local residents to identify the residents' preferences regarding such screening. But the administrative rule does not require that Oak Run submit a "vegetative screening plan," so this argument fails. *See Alamo Solar*, 2023-Ohio-3778, at ¶ 38 (observing that Adm.Code 4906-4-08(D)(4)(f) "doesn't require that the applicant commit to any specific type of visual screening").

{¶ 18} Nor does the rule require that Oak Run conduct any form of public outreach. However, in its application, Oak Run stated that it had engaged in public outreach and that it "is committed to working with those residents to develop and implement a vegetative screening plan for the Project." The local governments do not cite any authority requiring Oak Run to perform a level of public outreach that matches their preference.

{¶ 19} Moreover, the local governments fail to acknowledge that Oak Run did "[d]escribe measures," Adm.Code 4906-4-08(D)(4)(f), in its application for minimizing any adverse visual impacts of its facility. First, Oak Run stated that it had sited perimeter fencing at least 150 feet from the edge of adjacent roads and established 300-foot setbacks from adjacent residences. Second, it committed to using agricultural-style fencing that blends in with the surrounding landscape, eschewing industrial-looking chain-link fencing with barbed wire on top as is commonly used for such facilities. Finally, it committed to retaining existing trees and discussed vegetative screening with adjacent residents. The local governments are correct that these descriptions do not convey that Oak Run will "shield" the public's views of the facility, but the law does not require Oak Run to go so far. *See Alamo Solar* at ¶ 43 (observing that the applicants seeking board approval to

build a solar farm were not required to "completely screen" all views of their facilities and that the law "does not require the elimination of all adverse impacts" by such facilities).

{¶ 20} Notwithstanding the lack of an explicit statutory or administrative-rule requirement that an applicant use vegetative screening to minimize any adverse visual impacts caused by its facility, the board's staff recommended that Oak Run develop a landscape-and-lighting plan that "include[s] measures such as . . . vegetative screening." That recommendation was incorporated into the stipulation, and the board adopted it as a condition of granting the construction certificate. *See* 2024 WL 1465954 at *55, 81. Under the board's opinion and order, Oak Run now must file with the board a landscape-and-lighting plan in consultation with a licensed landscape architect, and the plan must address the facility's aesthetic and lighting impacts. Among other things, the plan must provide for vegetative screening that enhances views from affected residences, blends with the surrounding environment (unless an alternative arrangement is reached with an affected property owner), and addresses aesthetic impacts on passersby. Oak Run must also maintain vegetative screening for the life of the facility, replace failed plantings to ensure a 90 percent vegetation-survival rate after five years, maintain perimeter fencing for the life of the project, and install motion-activated lights focused narrowly inwards toward the facility. Once filed, the board's staff will review and confirm that the plan complies with this condition.

{¶ 21} The local governments mostly ignore the aspects of this condition that will help minimize any adverse visual impacts created by the facility. Instead, they fault the board for not requiring Oak Run to consult with affected residents about reducing the adverse visual impacts and for leaving plan details to be worked out in the future rather than being tested at the board's hearing. But the force of the former concern diminishes in view of the board's finding that Oak Run has "promised to continue working with local residents on the development and

implementation of the final vegetative screening plan for the Project," *id.* at \*57. As to the latter concern, "[i]t is well-settled that the board is not required to resolve every issue before issuing a certificate." *Harvey Solar*, 2025-Ohio-1503, at ¶ 24. Indeed, we have approved the board's procedure of allowing an applicant seeking a certificate to construct a solar farm to "flesh out details in the final version of the landscape plan as the construction process evolves," *id.* at ¶ 25.

**{¶ 22}** We accordingly reject the local governments' first proposition of law.

*B. Whether the board obtained the required visual-impact information to assess the proposed facility from public vantage points*

**{¶ 23}** In their second proposition of law, the local governments focus again on visual impacts, but this time under Adm.Code 4906-4-08(D)(4)(e), which requires an applicant to "[p]rovide photographic simulations or artist's pictorial sketches of the proposed facility from public vantage points that cover the range of landscapes, viewer groups, and types of scenic resources found within the study area." 2017-2018 Ohio Monthly Record 2-998, 2-3002 (effective Apr. 26, 2018). The local governments claim that Oak Run's project does not meet the rule's requirements because Oak Run did not provide the board with a photographic simulation or sketch showing the facility's substations, which contain support structures ranging in height from about 85 to 115 feet. The local governments maintain that an applicant's compliance with the rule enables the board to make the proper determinations under R.C. 4906.10(A)(2) ("[t]he nature of the probable environmental impact"), 4906.10(A)(3) ("the facility represents the minimum adverse environmental impact"), and 4906.10(A)(6) ("the facility will serve the public interest, convenience, and necessity").

**{¶ 24}** The board's rules define "facility" as "the proposed major utility facility and all associated facilities." Adm.Code 4906-1-01(W), 2015-2016 Ohio Monthly Record 2-1852, 2-1853 (effective Dec. 11, 2015). In its opinion and order,

the board did not determine that the project's substations fall outside the meaning of that term. But neither did it find that Oak Run's photographic simulations of the project display the proposed substations; indeed, one of Oak Run's witnesses testified that the application does not contain any simulations of the substations. Instead, the board determined that "at distances of approximately 0.4 miles, Oak Run's photo simulations show that the Project visibility decreases and is mostly absorbed into agricultural landscape" and that the project's visibility would continue to decrease over greater distances. 2024 WL 1465954 at *72.

{¶ 25} The board's rationale for determining that Oak Run's proposed solar farm "balance[s] the Project's public interest, convenience, and necessity" and satisfies the criteria set forth in R.C. 4906.10(A)(2), (3), and (6), 2024 WL 1465954 at *72, misses the mark. Of course an object's visibility decreases as one gets farther away from it, especially at a distance of almost a half mile. Adm.Code 4906-4-08(D)(4)(e), however, requires an applicant to do more than validate this truism. By failing to provide any photographic simulations or pictorial sketches from public vantage points that show the substations' support structures, which appear to be some of the project's tallest features, Oak Run did not meet the rule's requirements.

{¶ 26} The board rejoins that the local governments could have issued discovery requests and raised any issues they had with expert witnesses at the hearing. But under R.C. 4906.06(A)(6), an applicant for a certificate of construction of a major utility facility shall file with the board an application containing certain required information and "[s]uch other information as the applicant may consider relevant or as the board by rule or order may require." Plainly, this statutory provision contemplates that an applicant will provide the board with the necessary information in the first instance (i.e., upon filing its application) and not wait to do so during discovery or at the board's hearing.

{¶ 27} The board also asserts that to prevail in their contest against the issuance of a construction certificate, the local governments had to present "compelling evidence" establishing that Oak Run's application was incomplete. We find this argument puzzling, given that in its merit brief, the board does not dispute the local governments' assertion that Oak Run failed to depict the substations in a photographic simulation or pictorial sketch.

{¶ 28} For its part, Oak Run seems to contend that the substations do not constitute "facilities" under Adm.Code 4906-1-01(W). Under this view, Oak Run had no obligation to provide a photographic simulation or pictorial sketch of the substations. Although the board now seems to agree in its merit brief that the substations do fall within the meaning of "facility," it did not make such a determination in its orders. However, as we recently explained, "[a]n appellee may defend a lower tribunal's decision by asserting alternative grounds for affirmance than those adopted by the tribunal, without having to file a protective cross-appeal." *In re Applications of Dayton Power & Light Co.*, 2025-Ohio-2953, ¶ 97, citing *Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1107 (10th Cir. 2020). Accordingly, we address Oak Run's argument that the proposed substations do not constitute "facilities" under the rule.

{¶ 29} As explained above, "facility" means "the proposed major utility facility and all associated facilities." Adm.Code 4906-1-01(W). The board found, and there is no dispute, that Oak Run's proposed solar farm is a "major utility facility," as defined in R.C. 4906.01. But the term "facility" also encompasses "all associated facilities," which is defined by rule as "rights-of-way, land, permanent access roads, structures, tanks, distribution lines and *substations* necessary to interconnect the facility to the electric grid . . . and other equipment used for the generation of electricity." (Emphasis added.) Adm.Code 4906-1-01(F)(3), 2015-2016 Ohio Monthly Record 2-1852 (effective Dec. 11, 2015). When considering these definitions together, it is clear that the substations for Oak Run's project are

facilities and Oak Run was therefore required to provide the board with the visual-impact information set forth in Adm.Code 4906-4-08(D)(4)(e).

{¶ 30} Oak Run contends that some of the substations will be minimally visible because they will be located well inside the footprint of the project and others will be screened by trees. But the only evidence it offers in support of this assertion is a top-down aerial photograph that appears to have been taken by a camera thousands of feet in the air. A perspective from that position does not square with the ordinary meaning of "public vantage point," as that term is used in Adm.Code 4906-4-08(D)(4)(e), because a depiction of the facility from a high-flying aircraft is not from a "point of view" that is "accessible or visible to the community," *Merriam-Webster's Collegiate Dictionary* (11th Ed. 2003) (defining "vantage point" and "public," respectively).

{¶ 31} We sustain the local governments' second proposition of law: by failing to depict the proposed substations in accordance with Adm.Code 4906-4-08(D)(4)(e), Oak Run deprived the board of the information necessary for it to make the substantive statutory determinations regarding the visual impact of the proposed solar farm. We therefore reverse the board's orders in part and remand this matter to the board to consider evidence bearing on proper photographic simulations or an artist's pictorial sketches of the proposed substations.

C. *Whether the board obtained the required water-related information*

{¶ 32} In their third proposition of law, the local governments argue that the board erred in approving the project because Oak Run's application did not contain the water-related information required by Adm.Code 4906-4-07(C)(1)(d) and (C)(2)(b), 2015-2016 Ohio Monthly Record 2-1886, 2-1887 (effective Dec. 11, 2015). The local governments argue that had the board obtained the information, it would have been able to make an informed decision about whether construction activities would drive soil-laden water into streams, resulting in polluted water. They contend that because Oak Run's application did not contain the information

required by the rule, the board did not make the necessary findings and determinations under R.C. 4906.10(A)(2) ("[t]he nature of the probable environmental impact"), 4906.10(A)(3) ("the minimum adverse environmental impact"), 4906.10(A)(5) (the facility's compliance with various statutes and rules), and 4906.10(A)(6) ("the facility will serve the public interest, convenience, and necessity").

### 1. *Adm.Code 4906-4-07(C)(1)(d)*

{¶ 33} Adm.Code 4906-4-07(C)(1)(d) requires an applicant to provide "information regarding preconstruction water quality and permits" by describing "the existing water quality of the receiving stream based on at least one year of monitoring data, using appropriate Ohio environmental protection agency reporting requirements." The local governments argue that Oak Run did not comply with this provision of the rule in view of the testimony of one of Oak Run's witnesses, who said that the company did not submit one year of monitoring data addressing existing water quality in receiving streams.

{¶ 34} Even if that witness's testimony shows that Oak Run did not comply with Adm.Code 4906-4-07(C)(1)(d), we fail to see how the local governments have shown prejudice from Oak Run's noncompliance with that provision of the rule. We have said that "a showing of prejudice by the party seeking reversal" is "a basic point of procedure that is necessary to reverse a [board] order." (Cleaned up.) *In re Application of Ohio Power Co.*, 2014-Ohio-4271, ¶ 31; *see also In re Application of Duke Energy Ohio, Inc.*, 2021-Ohio-3301, ¶ 16 (observing that even if the board "misapplied its filing requirements," the appellant still had to show that it was harmed by the misapplication to warrant reversal of the board's order); *In re Application of Champaign Wind, L.L.C.*, 2016-Ohio-1513, ¶ 15 ("Even if the board errs in a procedural or evidentiary ruling, this court will not reverse the board's order unless the error prejudiced, i.e., meaningfully affected, the appellant.").

{¶ 35} The local governments are concerned that Oak Run's project will drive eroded soil into nearby streams by way of stormwater runoff, thereby degrading the water quality. While we acknowledge that knowing the preexisting water quality of nearby streams is necessary to determine how a solar farm will affect that quality, the local governments fail to cite any evidence establishing that the magnitude of runoff from Oak Run's project will be meaningful. They point to the testimony of an Oak Run witness who said that construction work "can" carry eroded soil into nearby streams, but that general statement fails to convey any details. They then speculate that Oak Run's extensive earthmoving will create "substantial opportunities" for soil-laden stormwater to flow into streams. But they do not cite any evidence to support that statement. The local governments simply have not explained how the water quality will be affected by Oak Run's project, which makes the preexisting water quality something of a moot point. Furthermore, as explained below, Oak Run presented evidence that the construction of its solar farm would not have a meaningful impact on nearby receiving streams.

{¶ 36} What is more, in its application for the construction certificate, Oak Run states that the project has been designed to avoid permanent impacts on streams and wetlands and that stormwater discharges are not expected to be significant and would be only temporary during construction of the project. It further states that the project will incorporate a stormwater-pollution-prevention plan ("SWPPP") that, among other things, adheres to specifications set out in the Rainwater and Land Development Manual published by the Ohio Department of Natural Resources ("ODNR"). The application establishes that the SWPPP will prevent construction activities from harming water resources.

{¶ 37} In sum, even if Oak Run did not strictly comply with Adm.Code 4906-4-07(C)(1)(d), the local governments have failed to show harm from Oak Run's noncompliance with that provision.

### 2. *Adm.Code 4906-4-07(C)(2)(b)*

{¶ 38} Adm.Code 4906-4-07(C)(2)(b) provides that an applicant must submit "[i]nformation regarding water quality during construction" by providing "[a]n estimate of the quality and quantity of aquatic discharges from the site clearing and construction operations, including runoff and siltation from dredging, filling, and construction of shoreside facilities." The local governments argue that Oak Run did not comply with that provision based on the testimony of an Oak Run witness who stated that the application does not contain an estimate of the quality and quantity of aquatic discharge during site-clearing and construction operations. They conclude that the board acted unlawfully and unreasonably in issuing a certificate without this information.

{¶ 39} However, our recent decision in *Harvey Solar*, 2025-Ohio-1503, counsels otherwise. In that case, we rejected a similar argument because the application explained that the project would not create any identifiable water-related discharges and that construction would entail limited activities requiring management of stormwater pollutants. *Id.* at ¶ 47-51. The application also explained that no significant changes in flow patterns or erosion were anticipated given the site's level ground, which required only limited grading. *Id.* at ¶ 51. We found that those descriptions met the rule's requirement that an application provide an "'estimate' of the 'quality and quantity of aquatic discharges' from construction operations." *Id.*, quoting Adm.Code 4906-4-07(C)(2)(b); *see also Alamo Solar*, 2023-Ohio-3778, at ¶ 64 (reaching a similar conclusion).

{¶ 40} *Harvey Solar* is instructive here. Oak Run explained in its application that project construction will not produce point-source aquatic discharges to streams or wetlands, and it notes that stormwater discharges during construction will be insignificant and temporary. Additionally, Oak Run stated in its application that significant changes in flow patterns are unexpected, noting that the project has been sited on agricultural land that will require minimal clearing and

grading. We therefore conclude that Oak Run complied with Adm.Code 4906-4-07(C)(2)(b).

{¶ 41} We accordingly reject the local governments' third proposition of law.

D. *Whether the board obtained the required plant and wildlife information*

{¶ 42} In their fourth proposition of law, the local governments assert that the board erred in approving the project without obtaining the plant and wildlife information required by Adm.Code 4906-4-08(B)(1)(c) and (d), 2017-2018 Ohio Monthly Record 2-2998, 2-3000 (effective Apr. 26, 2018). In the local governments' view, had the board obtained this information, it would have been positioned to make an informed decision about whether the project would harm plants and wildlife in the area. The local governments maintain that because the board did not obtain the information required by these rule provisions, it violated R.C. 4906.10(A)(2) ("[t]he nature of the probable environmental impact"), 4906.10(A)(3) ("the minimum adverse environmental impact"), and 4906.10(A)(6) ("the facility will serve the public interest, convenience, and necessity").

### 1. *Adm.Code 4906-4-08(B)(1)(c)*

{¶ 43} Adm.Code 4906-4-08(B)(1)(c) requires that an applicant "[p]rovide the results of a literature survey of the plant and animal life within at least one-fourth mile of the project area boundary. The literature survey shall include aquatic and terrestrial plant and animal species that are of commercial or recreational value, or species designated as endangered or threatened." The local governments claim that the board ran afoul of the rule because Oak Run performed a literature search for only threatened and endangered plant and animal species, eschewing other species that are of commercial or recreational value but are not threatened or endangered.

{¶ 44} The record shows that in performing its literature search, Oak Run relied on information compiled by ODNR and the United States Fish and Wildlife

Service pertaining to threatened and endangered species ("listed species") in the project area. Based on this information, Oak Run identified 25 listed species in the project area.

{¶ 45} But while the local governments are technically correct that Oak Run's literature search did not extend beyond listed species, they ignore that other information in the record touches on the project's potential effect on unlisted species. For example, Oak Run presented the direct testimony of Courtney Dohoney, a senior associate project manager with Stantec Consulting Services, Inc., which managed the associated surveys and assessments that Oak Run provided to the board in conjunction with its application. Dohoney has been an environmental consultant in the renewable-energy sector for 17 years and has a Master's degree in environmental management from Duke University. Dohoney testified that the project was not anticipated to affect unlisted wildlife. She explained Oak Run's plan to develop wildlife corridors to allow wildlife to move through the project area and to design perimeter fencing that would keep the area stream open and unobstructed for wildlife. Given this testimony, it is hard to see how the local governments were prejudiced by Oak Run's failure to conduct a literature search for unlisted wildlife. *See Ohio Power Co.*, 2014-Ohio-4271, at ¶ 31.

{¶ 46} As for unlisted plants, Oak Run's application contained information establishing that the project site is predominantly composed of cropland, with smatterings of upland forest, grassland, scrub shrub, and hydrophytic vegetation. That is, the application apprised the board of the existence of plant species outside of those classified as threatened or endangered. Oak Run accordingly provided the board with what the local governments claim is missing.

{¶ 47} In sum, we conclude that the local governments have not been prejudiced by any deficiency in Oak Run's literature search.

### 2. Adm.Code 4906-4-08(B)(1)(d)

{¶ 48} Adm.Code 4906-4-08(B)(1)(d) requires an applicant to "[c]onduct and provide the results of field surveys of the plant and animal species identified in the literature survey." The local governments argue that Oak Run did not comply with this rule provision, because it "did no field surveys other than to look for bats." The literature survey submitted with Oak Run's application identified 25 listed species, but Dohoney testified that the field survey conducted as part of Oak Run's application was limited to bats. Adm.Code 4906-4-08(B)(1)(d) directs that the applicant provide the results of a field survey of the species identified in the literature survey, not a subset of those species, but it does not "prescribe[] a specific methodology for how field surveys are to be conducted," *Alamo Solar*, 2023-Ohio-3778, at ¶ 51.

{¶ 49} Even with this in mind, Oak Run did not comply with the rule in conducting its field survey, because its literature survey listed birds, fish, and mussels, in addition to bats. However, for us to reverse the board's orders, the local governments must show that they have been prejudiced by this rule violation. They have not made that showing. Dohoney testified, and the board's staff reported, that the Oak Run project is not expected to result in significant impacts to listed species. And as previously stated, the evidence establishes that the project is not anticipated to impact unlisted wildlife. As for plants, the local governments failed to furnish any evidence establishing that a field survey for plants would have been likely to uncover the existence of new vegetation beyond that which is already known to be in the area. And besides, the staff report noted that vegetative impacts would primarily affect agricultural land. In sum, we conclude that the local governments were not prejudiced by any deficiencies in Oak Run's field survey.

{¶ 50} We accordingly reject the local governments' fourth proposition of law.

### 3. The prejudice analysis for the third and fourth propositions of law differs from the analysis for the second proposition of law

{¶ 51} The first and third opinions concurring in part and dissenting in part criticize this opinion for analyzing the second proposition of law differently from the third and fourth propositions of law regarding the question whether the local governments have been prejudiced by Oak Run's statutory noncompliance. *See* opinion concurring in part and dissenting in part of Kennedy, C.J., ¶ 80-81; opinion concurring in part and dissenting in part of Hawkins, J., ¶ 116, 121. Those separate opinions equate Oak Run's failure to provide the board with certain visual-impact information under Adm.Code 4906-4-08(D)(4)(e) with its failure to provide the board with baseline water-quality information under Adm.Code 4906-4-07(C)(1)(d) and (C)(2)(b) and plant and wildlife information under Adm.Code 4906-4-08(B)(1)(c) and (d). However, in doing so, the first and third opinions concurring in part and dissenting in part mistakenly collapse the prejudice analysis into the statutory-compliance analysis. Oak Run's project would not have the same effect on local water quality and plants and wildlife as it would have on the neighborhood viewshed; that difference affects our prejudice analysis under each proposition of law and results in different conclusions regarding the resulting harm to the local governments.

{¶ 52} As explained above, an applicant's noncompliance with a statutory requirement alone is not enough to warrant reversal of a board order. A party seeking reversal of a board order must also show that it has been prejudiced by the applicant's statutory noncompliance. *See Ohio Power Co.*, 2014-Ohio-4271, at ¶ 31. To find prejudice, we must be presented with record evidence showing that the project's impact on the local area would meaningfully change whatever the baseline metric is. Here, the local governments have not shown how Oak Run's project would meaningfully affect the water quality or plants and wildlife in the project area. Therefore, the record evidence supports our conclusions under the

third and fourth propositions of law that the local governments have not shown prejudice. And since there would likely be minimal impact on local water quality and plants and wildlife with construction of the project, providing baseline information regarding those metrics becomes less essential to the analysis, because the project would not significantly change those things. To hold otherwise would condense the two-part inquiry into the question whether an applicant strictly complied with the statutory requirements when seeking a certificate for the construction of a major utility facility.

{¶ 53} However, the visual-impact information that an applicant is required to provide the board under Adm.Code 4906-4-08(D)(4)(e) is different. Oak Run plans to erect several support structures that will range in height between 85 and 115 feet. Oak Run does not dispute the eventual construction of these structures and instead argues that such structures do not statutorily qualify as "facilities," an argument that we reject. Whereas the local governments have not shown that the project would affect the preexisting water quality or the local plants and wildlife, the difference in terms of Oak Run's failure to present the requisite visual-impact information is significant. Constructing several 85- to 115-foot structures would present a significant departure in the viewshed from what the baseline is (i.e., the viewshed without those structures).

{¶ 54} Because the construction of the support structures would significantly alter the viewshed, the visual-impact information required under the administrative rules becomes more crucial, and the local governments have been prejudiced by Oak Run's failure to provide that information. This is the key difference between the local governments' second proposition of law and its third and fourth propositions of law and why we find that the local governments have been prejudiced only by Oak Run's failure to provide the board with the requisite visual-impact information.

*E. Whether the board adequately accounted for safety concerns*

{¶ 55} In their fifth proposition of law, the local governments contend that the board erred in finding that Oak Run's project complies with R.C. 4906.10(A)(2) ("[t]he nature of the probable environmental impact"), 4906.10(A)(3) ("the facility represents the minimum adverse environmental impact"), and 4906.10(A)(6) ("the facility will serve the public interest, convenience, and necessity"), despite the threats posed to the area by the project's planned BESS. The local governments say that if the BESS were to fail, then fires and toxic gas could spread into the community. The local governments contend that despite knowing these risks, the board did not adopt adequate measures to protect against them.

## 1. Jurisdiction

{¶ 56} Before addressing the merits of this argument, we must determine whether we have jurisdiction to do so. According to Oak Run and the board, because the local governments failed to set forth the argument in their amended notice of appeal, this court lacks jurisdiction to address it. They are mistaken.

{¶ 57} The procedure for seeking reversal of a board order is by filing a notice of appeal "setting forth the order appealed from and the errors complained of." R.C. 4903.13; *see also* R.C. 4906.12. We have held that "[t]he assignments of error enumerated in a notice of appeal 'delimit the issues' for the court's consideration." *In re Complaints of Lycourt-Donovan v. Columbia Gas of Ohio, Inc.*, 2017-Ohio-7566, ¶ 44, quoting *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.*, 2004-Ohio-5466, ¶ 21. Accordingly, "[a] claim not set forth in the notice of appeal deprives the court of jurisdiction to consider it." *Id.*

{¶ 58} In their amended notice of appeal, the local governments complain of eight errors, none of which explicitly speak in terms of the local governments' safety concerns associated with the BESS. Even so, the local governments' sixth assignment of error in its amended notice of appeal cites pages 2 and 40 through 44 of its rehearing application filed with the board, and those pages do speak to the

local governments' concerns about the BESS. "We have held that the sufficiency of a notice of appeal is 'judged not merely by the form of words used but also by their context.'" *In re Letter of Notification Application of Columbia Gas of Ohio, Inc.*, 2024-Ohio-4747, at ¶ 20, quoting *Lycourt-Donovan* at ¶ 45 (concluding that the appellant had preserved a claim for review because its notice of appeal cited to the pages of its rehearing application where it raised its claim of error to the Public Utilities Commission). Applying this precept, we conclude that the local governments preserved their BESS argument, and we therefore have jurisdiction to address the merits of the local governments' fifth proposition of law.

## *2. Merits*

{¶ 59} Turning to the merits of the local governments' fifth proposition of law, the record establishes that Oak Run's project will house a BESS consisting of approximately 328 battery containers, along with 82 inverters and 82 transformers. The BESS will consist of two equipment areas that occupy about 11 acres each within the project area. Oak Run plans to use lithium-ion-battery technology.

{¶ 60} The local governments maintain that the board did not go far enough to protect against the risks of harm posed by the BESS. They point to evidence showing that lithium-ion batteries can catch fire and release toxic gas. And there appears to be no dispute that there is no effective way to extinguish a lithium-ion-battery fire and that after a fire starts, the only recourse is to try to prevent the fire from spreading. In view of these risks, the local governments assert that the board should not have approved the project without requiring Oak Run to provide for measures to prevent the spread of fire and the release of fumes into the community and that the board should have been more thorough in evaluating the availability of water supplies to contain a fire once it starts.

{¶ 61} However, the local governments fail to contend with the full evidentiary record regarding the BESS, its benefits, any potential risks it poses, and the steps Oak Run would take to minimize those risks. Based on its review of the

22

evidence, the board found that the risks posed by the BESS do not outweigh the benefits. *See* 2024 WL 1465954 at *74; 2024 WL 4039785 at *8. As the board observed, even the evidence put forth by one member of the local governments established that the threat posed by lithium-ion batteries is unlikely to materialize so long as the system is properly maintained, monitored, and secured. 2024 WL 1465954 at *74

{¶ 62} The local governments have failed to show that the BESS would not be properly maintained, monitored, or secured, especially considering that Oak Run intends to use warning signs, fencing, and gates to restrict access to the BESS. Further, the BESS will be sited with enough distance from other equipment to ensure that fire propagation does not occur, and the BESS will be located almost one mile away from the nearest neighbors. The BESS will conform to the National Fire Protection Association's Standard for the Installation of Stationary Energy Storage Systems, and a fire-protection engineer will review the fire-protection design of the facility. Oak Run will develop an emergency-services-and-response plan in consultation with local authorities, provide fire and emergency responders with training and proper firefighting equipment to enable them to respond to emergency situations at the BESS, and collaborate with local authorities to ensure that sufficient water resources and a long-term water supply are available for any firefighting needs, in accordance with the applicable fire code.

{¶ 63} The local governments object to the board's allowing Oak Run to work out some of the safety-related details in the future. As an example, one of the conditions the board imposed in approving Oak Run's application and granting it a construction certificate provides that at least 30 days before the preconstruction conference, Oak Run must file its emergency-services-and-response plan on the board's docket for the staff's review. *See* 2024 WL 1465954 at *54-55, citing Joint Exhibit No.1 (the staff's report), Condition 17; 2024 WL 4039785 at *8.

{¶ 64} "It is well-settled that the board is not required to resolve every issue before issuing a certificate." *Harvey Solar*, 2025-Ohio-1503, at ¶ 24. The board is empowered to "impose conditions that are subject to monitoring for compliance by board staff." *Alamo Solar*, 2023-Ohio-3778, at ¶ 41. Here, the board's decision to allow Oak Run to work out some of the safety-related details of the proposed solar facility and to impose on Oak Run certain conditions regarding those details does not warrant reversal here.

{¶ 65} The first and third opinions concurring in part and dissenting in part acknowledge that "the board is not required to resolve every issue before issuing a certificate," only to then turn around and require exactly that with respect to this proposition of law. (Cleaned up.) Opinion concurring in part and dissenting in part of Kennedy, C.J., at ¶ 82; opinion concurring in part and dissenting in part of Hawkins, J., at ¶ 123, 127. Clearly, there is a limit to the details that can be fleshed out in the future, but the deficiencies that the local governments allege regarding the safety concerns presented by the BESS are well within the boundaries of what can be fleshed out at a later date. There is no evidence in the record showing that the risks associated with the BESS will materialize into actual harm beyond the possibility that they *could* materialize into actual harm—something that is true with any potentially hazardous material, regardless of the preventative steps taken—and the board has imposed certain requirements on Oak Run to address the local governments' safety concerns. We think the BESS's ultimate compliance with the National Fire Protection Association's Standard for the Installation of Stationary Energy Storage Systems is a better safeguard than this court's collective armchair firefighting expertise.

{¶ 66} We accordingly reject the local governments' fifth proposition of law.

*F. Whether the board obtained a completed application from Oak Run*

**{¶ 67}** In their sixth proposition of law, the local governments echo previous themes, namely, that Oak Run did not file a complete application. But whereas before, the local governments focused on Oak Run's compliance with particular board rules, here they focus more on first principles. They argue that Ohio law puts the burden on an applicant to prove that its project meets the requirements set forth in R.C. 4906.10(A), and they stress that the fairness and accuracy of the board's adjudicatory process, as well as the public's ability to meaningfully participate in that process, depend on the existence of a completed application that has been submitted in compliance with the board's rules. They argue that by allowing this matter to proceed to a hearing and decision without a complete application, the board shifted the burden of proof from Oak Run to the local governments, requiring the latter to prove that the project does not comply with the statute. The local governments also suggest that allowing this matter to proceed to a hearing without a complete application is itself grounds for reversal of the board's orders.

### 1. Jurisdiction

**{¶ 68}** Before addressing the merits of this argument, we must again decide whether we have jurisdiction over it. According to Oak Run and the board, because the local governments failed raise this argument in their amended notice of appeal, we lack jurisdiction to address it. Again, they are mistaken.

**{¶ 69}** None of the eight errors complained of in the local governments' amended notice of appeal are written in the language reflected in their sixth proposition of law. Even so, each error listed in the amended notice of appeal cites pages 47 through 53 of the local governments' rehearing application, which advances the same argument contained in their sixth proposition of law. By citing the relevant pages of their rehearing application in their amended notice of appeal, the local governments have preserved their sixth proposition of law under R.C.

4903.13.  *See Notification Application of Columbia Gas*, 2024-Ohio-4747, at ¶ 20.  Accordingly, we reject Oak Run's and the board's jurisdictional argument and will address the merits of the local governments' sixth proposition of law.

### 2. Merits

{¶ 70} As previously stated, an applicant for a certificate of construction of a major utility facility shall file with the board an application containing certain statutorily required information and "[s]uch other information as the applicant may consider relevant or as the board by rule or order may require."   R.C. 4906.06(A)(6).   After receiving an application, the board's chairperson shall examine it and determine whether it complies with Adm.Code 4906-1 through 4906-7.   Adm.Code 4906-3-06(A), 2015-2016 Ohio Monthly Record 2-1877 (effective Dec. 11, 2015).  Within 60 days of receipt, the chairperson shall either accept the application as complete or reject it as incomplete.  *Id.*  Upon receiving an application that complies with R.C. 4906.06, the board shall fix a date for a public hearing.  R.C. 4906.07(A).

{¶ 71} In this case, the board informed Oak Run that it had filed a statutorily compliant application, enabling the board's staff to begin reviewing the application, but the board cautioned Oak Run that staff might request additional information.  Some of the local governments disagreed that Oak Run had filed a statutorily compliant application, so they filed a motion with the board requesting that it issue an order directing Oak Run to file a supplement to its application.  Among other things, some of the local governments argued before the board, as they do here, that Oak Run's application did not contain enough information concerning visual impacts, water-quality and mitigation measures, and plants and wildlife.  At the board's hearing, an attorney examiner orally denied the motion, and in its opinion and order, the board affirmed this ruling, explaining that the local governments had an opportunity to request further information through discovery and to raise issues

with expert witnesses during the evidentiary hearing. *See* 2024 WL 1465954 at *37; 2024 WL 4039785 at *9.

{¶ 72} The fact that the board disagreed with the local governments about the completeness of Oak Run's application does not mean, as the local governments contend, that the board shifted the burden of proof to them to prove that the project does not comply with R.C. 4906.10(A). To begin with, the local governments have not identified a guiding principle to assist us in determining when an administrative agency has flipped the burden of proof from an applicant to an intervenor. Rather, they seem to intuit that because they perceived the application to be incomplete, they were left to disprove its completeness. The local governments must offer more than a bare assertion to show reversible error. *See Duke Energy Ohio*, 2021-Ohio-3301, at ¶ 35 ("The lack of an authority-based argument defeats [appellant's] contention."). Beyond this, the local governments' premise is simply wrong. Nothing in the board's decision conveys that the board presupposed that Oak Run's project was in accord with R.C. 4906.10(A)'s criteria and left it to the local governments to disprove this presupposition. To the contrary, the board's opinion and order plainly establishes that the board viewed the evidence as "support[ing] a finding that all the criteria in R.C. 4906.10(A) are satisfied for the construction, operation, and maintenance of the Facility," 2024 WL 1465954 at *81.

{¶ 73} The local governments also suggest that their ability to meaningfully participate in the board's process was thwarted by Oak Run's incomplete application.[2] In facing such arguments before, we have observed that while an

___

2. The local governments also say that Oak Run's incomplete application thwarted the general public's ability to provide informed input on the project. Because the general public is not a party to this case and the local governments are, we focus on the interests of the latter. *See State ex rel. Martens v. Findlay Mun. Court*, 2024-Ohio-5667, ¶ 10 ("The judicial power is the power to decide specific cases between conflicting parties."), citing *Staton v. State Tax Comm.*, 114 Ohio St. 658, 671-672 (1926). That said, it bears mentioning that before the board held its evidentiary hearing on Oak Run's application, it held a local public hearing in the community near where the project will be sited, and at the time of the local public hearing, the board's publicly available docket contained, among other things, the staff's report and dozens of filings from Oak Run containing thousands of

"information asymmetry will often exist between [an applicant] and [the applicant's] opponent," tools remain available for an opponent "to make its case." *Duke Energy Ohio* at ¶ 25, citing Adm.Code. 4906-2-14 (discovery), Adm.Code 4906-2-18 (depositions), Adm.Code 4906-2-22 (motions to compel discovery), and Adm.Code 4906-2-23 (subpoenas). The same is true here. In addition to the tools outlined in *Duke Energy Ohio*, the local governments had the opportunity in this case to present testimony from their own witnesses, submit evidence for the record, and cross-examine Oak Run's witnesses. These tools enabled the local governments to meaningfully participate in the case.

{¶ 74} The local governments assert in their merit brief that discovery and cross-examination of witnesses cannot produce the studies required by the board's rules, because those studies "do not exist until an applicant generates them." While that may be true, if discovery and cross-examination by an applicant's opponent establish that the applicant failed to produce a study contemplated by a board rule and that the opponent suffered harm from the applicant's violation of the rule, then the opponent will have shown that the board committed reversible error in issuing an order approving the application, and we may accordingly enter judgment reversing the board's order and directing the board on remand to comply with its rule.

{¶ 75} Lastly, the local governments are mistaken in their argument that allowing the matter to proceed to a hearing without a complete application is itself grounds for reversal. R.C. 4906.07(A) provides that the commission shall fix a date for a public hearing after receiving an application that complies with R.C. 4906.06. But as discussed above, to secure reversal of the board's orders, the local governments must show that they suffered prejudice from the orders, not merely

pages. When viewed in this context, the local governments' position that the board "eviscerated the public's right to [provide] meaningful input" on the matter is unpersuasive.

that the board violated one of its own rules or, as the local governments argue here, a statute. *See In re Complaint of Buckeye Energy Brokers, Inc. v. Palmer Energy Co.*, 2014-Ohio-1532, ¶ 22 (observing that "[c]ase law is clear that an allegedly aggrieved party must show that it suffered prejudice from a [board] order to warrant reversal," and rejecting the appellant's argument that a violation of a "certification statute[] causes inherent harm"). Our analysis of the local governments' first five propositions of law establishes that we have already considered whether the board's orders were decided on an incomplete application and caused prejudice to the local governments. That analysis suffices for the purpose of the argument that the local governments raise here.

{¶ 76} We accordingly reject the local governments' sixth proposition of law.

### III. CONCLUSION

{¶ 77} The Ohio Power Siting Board's orders are affirmed in part and reversed in part, and we remand this matter to the board with instructions that it more thoroughly address the Oak Run project's visual impacts in accord with the reasoning set forth herein analyzing the local governments' second proposition of law.

Orders affirmed in part

and reversed in part

and cause remanded.

_____

**KENNEDY, C.J., concurring in part and dissenting in part.**

{¶ 78} I fully join the third opinion concurring in part in and dissenting in part from the court's judgment: I agree with the lead opinion's decision requiring appellee, the Ohio Power Siting Board, to obtain and review photographic simulations or pictorial sketches of the major utility facility proposed by intervening appellee, Oak Run Solar Project, L.L.C. However, Oak Run also failed

to provide adequate information regarding local water quality, local plant and wildlife, and the battery-energy-storage system ("BESS") that would be built as part of the project. I would find that appellants, the Board of Trustees for Somerford Township, the Board of Trustees for Deercreek Township, the Board of Trustees for Monroe Township, and the Madison County Board of Commissioners ("the local governments"), were prejudiced by these failures and by the board's impermissible burden shifting. I write separately to emphasize how arbitrary and unreasonable the lead opinion's decision is.

{¶ 79} The board is a creature of statute. *See* R.C. 4906.02. Before it may grant a certificate for the construction of a major utility facility, the board must make specific findings based on information submitted by the applicant under R.C. Ch. 4906 and the board's associated rules. The burden of providing a complete application to the board is on the applicant. *See* R.C. 4906.06(A).

{¶ 80} Oak Run did not satisfy its burden. It not only failed to provide the board with photographic simulations or pictorial sketches of the proposed facility, *see* lead opinion, ¶ 25, but it also failed to provide adequate water-quality studies, *see id.* at ¶ 34, precise estimates of the quality and quantity of stormwater discharges expected during construction of the facility, *see id.* at ¶ 40, literature surveys regarding nonendangered species in the project area, *see id.* at ¶ 45, field surveys of wildlife in the project area, *see id.* at ¶ 49, and an emergency-services-and-response plan related to the BESS, *see id.* at ¶ 63.

{¶ 81} The water-quality and plant and wildlife data are necessary because they provide important baseline information about the proposed-project area, allowing the project's effects to be adequately gauged. It is common sense that one cannot measure a project's environmental impacts, or adequately estimate its risks, without a thorough understanding of the project area before construction begins. Granting a construction certificate to Oak Run when it has failed to provide this

information harms the local governments by making it impossible to assess the project's potential and actual environmental impacts.

{¶ 82} The local governments have also been prejudiced by Oak Run's incomplete emergency-services-and-response plan. Again, as the applicant, Oak Run bears the burden of providing that information. *See* R.C. 4906.06(A). The local governments need not "show that the BESS would not be properly maintained, monitored, or secured," as the lead opinion asserts, lead opinion at ¶ 62. While "'the board is not required to resolve every issue before issuing a certificate,'" *id.* at ¶ 21, 64, quoting *In re Application of Harvey Solar I, L.L.C.*, 2025-Ohio-1503, ¶ 24, leaving major features of a safety plan up in the air—like the identification of a water source for preventing the spread of a lithium-ion-battery fire—is unreasonable.

{¶ 83} These are not minute details that can be filled in later, nor are the harms these omissions could cause easily rectified after the fact—in no small part because without baseline data, the actual risks and ultimate toll of Oak Run's proposed project are hard to know. Oak Run neglected to provide entire surveys and plans, not just a few stray details. Drawing the line at photographic simulations and pictorial sketches, but not at water-quality studies, wildlife surveys, or fire-safety plans, is arbitrary. The lead opinion lowers the bar that applicants seeking a certificate to construct a major utility facility must clear, contrary to law. There is a difference between allowing an applicant to "'flesh out [the] details'" of a proposed project in its final plan, *id.* at ¶ 21, quoting *Harvey Solar* at ¶ 25, and allowing an applicant to escape its information-production burden.

{¶ 84} I would require Oak Run to satisfy its burden to produce to the board information regarding baseline water-quality studies and local plant- and animal-life surveys in the proposed-project area, as well as submit to the board a detailed emergency-services-and-response plan. Because the court does otherwise, I concur in part in and dissent in part from its judgment.

_____

**BRUNNER, J., concurring in part and dissenting in part.**

{¶ 85} I concur in the lead opinion with the exception of Part II(B). I would find that appellee, the Ohio Power Siting Board, had before it adequate information from which to determine the visual impacts of the proposed project. The record contains sufficient depictions of intervening appellee Oak Run Solar Project, L.L.C.'s proposed major utility facility from numerous public vantage points. I therefore concur in part in and dissent in part from the court's judgment and would affirm the board's orders granting Oak Run's application for a certificate of environmental compatibility and public need to construct a solar-powered electric-generation facility.

## I. Determining the visual impacts of the proposed solar project

{¶ 86} Appellants, the Board of Trustees for Somerford Township, the Board of Trustees for Deercreek Township, the Board of Trustees for Monroe Township, and the Madison County Board of Commissioners (collectively, "the local governments"), oppose Oak Run's proposed project. They argue that Oak Run did not provide depictions of the project's substations with its application and allege that, as a result, the board did not have the necessary information concerning the visual impacts of the project to make necessary, informed determinations regarding whether the project represents the minimum adverse environmental impacts under R.C. 4906.10(A)(3) and whether the project serves the public interest, convenience, and necessity under R.C. 4906.10(A)(6).

{¶ 87} The fact that a particular component of the proposed project was not specifically depicted in a visual format along with the depictions of other components of the project that were submitted with Oak Run's application does not necessarily mean that the board did not have the information necessary to adequately determine the project's visual impacts. The visual depictions of a proposed project as described in former Adm.Code 4906-4-08(D)(4)(e) that are to

be submitted with an application for a construction certificate provide the board preliminary information about the visual impacts of the proposed project. 2017-2018 Ohio Monthly Record 2-998, 2-3002 (effective Apr. 26, 2018); *see, e.g.*, *In re Application of S. Branch Solar, L.L.C.*, 2025-Ohio-5679, ¶ 27 ("A wildlife-literature survey is a component of an application, but it is not the only information the board receives about the potential ecological impacts of a project."). Because the final design of a project may change during the application process in response to concerns voiced by local citizens about the project—for example, the exact size of the solar panels that are ultimately used may not be finalized when the application is filed, *see In re Alamo Solar I, L.L.C.*, 2023-Ohio-3778, ¶ 34, or the board may impose conditions requiring that certain design elements be used in the construction of the project, *see id.* at ¶ 41—these visual depictions are informative, but they are not determinative of nor do they limit board-approved changes to what the project will look like once it is finally approved. *See S. Branch Solar* at ¶ 52.

{¶ 88} This is because the certification process is a "'dynamic process,'" *id.* at ¶ 11, quoting *In re Application of Buckeye Wind, L.L.C.*, 2012-Ohio-878, ¶ 16 (lead opinion), one in which the board has the authority to require an applicant to provide additional information or conduct additional studies, *see* R.C. 4906.03(A) and (B). Furthermore, the board may waive requirements set forth in its own rules that are not mandated by statute. *See* former Adm.Code 4906-4-01(B), 2015-2016 Ohio Monthly Record 2-1882, 2-1883 (effective Dec. 11, 2015). And even after issuing a certificate for the construction of a major utility facility, the board retains the authority to monitor the applicant's compliance with any conditions that the board imposed in granting the certificate and to ensure that the applicant continues to take steps to adequately mitigate any potential negative impacts of the facility. *See S. Branch Solar* at ¶ 11.

{¶ 89} Former Adm.Code 4906-4-08(D)(4)(e) required Oak Run to provide with its application photographic simulations or artist's pictorial sketches of the

proposed facility from a range of public vantage points, with accompanying explanations of the vantage points selected. The rule did not require Oak Run to provide the board with depictions of every feature of the proposed project from every possible public vantage point. Applying the rule to require this would result in a laborious if not endless application process. The local governments argue that the project's substations, in particular, are "intrusive[] . . . looming structures," so it may be expected that the board would ask for some depictions of these structures to help it assess the overall viewshed of the project.

**{¶ 90}** But it is too simplistic to equate the lack of any depictions of these "looming" structures in Oak Run's application to a failure of the board to consider the potential negative impacts the substations would have on the viewshed in the proposed-project area. It is a convenient misrepresentation of the record to assert that the only depiction of the substations that the board considered was "a top-down aerial photograph that appears to have been taken by a camera thousands of feet in the air," lead opinion, ¶ 30.

**{¶ 91}** Contrary to the lead opinion's myopic view of the record, even a cursory review of it plainly shows that the board could sufficiently determine the visual impacts of the proposed project's tallest structures. It is quite obvious that any depiction of any unbuilt structure would provide only a general representation of the visual impacts it would have on the area, not a definitive visual depiction of every detail the structure would have once built. Whether the board should have required Oak Run to submit additional visual depictions of the substations or certain substation components before issuing a construction certificate is immaterial because the local governments have not shown a realistic possibility that the board would have reached a different conclusion but for that alleged error. *Compare S. Branch Solar*, 2025-Ohio-5679, at ¶ 33 (finding that challenger to board's approval of construction certificate for a major utility facility failed to show how the board's decision resulted in harm to him), *with In re Black Fork Wind Energy, L.L.C.*, 2018-

34

Ohio-5206, ¶ 25 (finding harm when the appellants showed "a realistic possibility of a different outcome but for the board's error").

## II. The board's determination regarding the visual impacts of the proposed project was not unreasonable

### A. Understanding the components of the proposed project's substations

**{¶ 92}** Regarding the visual impacts of the proposed project, the local governments are concerned primarily with the project's three substations, each of which would be as high as 115 feet at some points and would occupy approximately 15 to 18 acres. When Oak Run filed its application with photographic and pictorial renditions of the project, the substations had not yet been designed. So it is fair to question how the substations could alter the existing viewshed. As explained below, the record evidence in this case plainly shows the potential visual impacts the substations would have on the existing viewshed, even without their being depicted in the visual simulations.

**{¶ 93}** For example, Oak Run's application includes an aerial map of the proposed project area depicting where the project's substations would be located. According to the application, underground cables would carry the electricity generated from the solar panels to two substations located in the interior area of the project. The electricity would then be carried from the substations using generation tie-in ("gen-tie") lines mounted approximately 120 feet above the ground on steel-monopole structures. The two interior substations appear on the map as squares with light-green diagonal lines, and they are shown as being surrounded by solar-panel arrays, which are designated in red. The gen-tie lines will connect to a "step-up" substation, which is shown on the map as a square with teal-green crosshatching and is located at the entrance of the project area.



{¶ 94} Each substation would contain a dead-end support structure[3] and be equipped with at least one lightning mast. These structures would be approximately 85 to 115 feet tall. The board's staff explained in its report that the major components of the two interior substations would include two transformers, circuit breakers, surge arrestors, insulators, site-security fencing, control houses, and a lightning mast. Staff explained that the step-up substation would have similar components, including two additional transformers and a concrete barrier to mitigate noise. The application indicates that the concrete barrier around the step-up substation would be approximately 22 feet tall.

{¶ 95} Michael Ivy, a senior development engineer for the proposed project, testified at the board's hearing that the transformers that would be located at the two interior substations could range in height from 15 to 20 feet. Even if Oak Run were to use the largest solar panels considered for the project, the panels themselves, depending on their angle, would be a maximum height of about 12 feet.

---

3. A description of this structure could not be located in the record.

**{¶ 96}** Yet in finding that the board lacked the necessary information to determine the visual impacts of the proposed project, the lead opinion does not explain which components of the proposed project's substations the board failed to consider—the 15- to 20-foot transformers, the 85- to 115-foot lightning masts, the dead-end support structures, the 22-foot concrete barrier, the solar panels (their size or placement), or all of the above. Remanding this matter to the board to further consider "evidence bearing on proper photographic simulations or an artist's pictorial sketches of the proposed substations," lead opinion at ¶ 31, without explaining what the substations actually consist of misses the mark. Understanding the components of the project's substations allows us to identify what may be missing from the simulations and photographs that Oak Run already submitted, and it renders remand unnecessary.

*B. The board had sufficient evidence to consider the visual impacts of the components of the proposed project's substations*

**{¶ 97}** Oak Run did not include with its application visual renditions of the proposed project's substations or their components, but it explained to the board that those parts of the project would be minimally visible from public vantage points, given their locations inside the solar-panel arrays and their distance from neighboring residences. Oak Run argued in its reply brief filed with the board that the step-up substation would be screened by trees and would be minimally visible, if visible at all, from the vantage points identified in its application. Essentially, even if Oak Run provides the board with depictions of the project's substations and their components, those parts of the project would be seen minimally, if at all, from public vantage points.

**{¶ 98}** It is clear from the record that the board recognized this: in its decision, the board specifically referred to the photographic simulations that Oak Run submitted with its application and made the factual finding that at distances of about 0.4 miles, the proposed project is "mostly absorbed into agricultural

landscape," 2024 WL 1465954, *72 (Mar. 21, 2024). It further found that the project would "become less noticeable in views greater than one mile at which point the individual modules [would] not be distinguishable and [would] appear contained within the existing agricultural setting." *Id.* The board cited numerous parts of the record in support of its findings and concluded that

> as a result of components incorporated into the Project design, including vegetation, proposed Project structures, atmospheric conditions, landscape and lighting plans and Oak Run's provided distance decay estimates and simulations, viewshed of the Project should be mostly absorbed into the landscape.

*Id.* at *48. This conclusion was not derived from thin air or based only on the aerial map that Oak Run submitted with its application, as the lead opinion irresponsibly states, *see* lead opinion at ¶ 30; the facts supporting this conclusion are found in the record.

{¶ 99} In its application, Oak Run included a visual-impact report prepared by Stantec Consulting Services, Inc., that contains numerous pictures of the proposed project from different public vantage points called key-observation points ("KOPs)," such as the roads traveled in and around the project area. Because the substation facilities had not yet been designed, that report focused mainly on the visual effects of the solar modules and the gen-tie lines.

{¶ 100} Oak Run's senior development engineer, Ivy, explained to the board at its hearing that some figures in the report show the proposed project site as it currently looks and others contain simulations of the solar-panel arrays and other aspects of the project. For example, Figure 6a shows the western view of the project site as it currently appears from a nearby roadside identified as KOP 2:



6a) View to the west from KOP 2. This viewpoint is located near the eastern boundary of the Project site from the southbound lane of Rosedale Milford Center Road.

**{¶ 101}** The next figure in the report, Figure 6b, depicts the same area but includes a simulation of the solar-panel arrays that would be used in the proposed project; the simulation shows that solar-panel arrays would be set less than 0.1 mile away from KOP 2:



6b) View from KOP 2 with the Project simulated. The solar modules would be placed less than 0.1 mile away and occupy the entire view. The proposed transmission line would be about 1 mile away and appear just above the solar modules in the left side of the view.

Figure 6b does not show the fencing or vegetative screening that Oak Run agreed to use to minimize views of the project. As the caption explains, Figure 6b also depicts part of a gen-tie line, which would be located about one mile away from KOP 2, making it barely visible above the tree line in the left-side background of the image. Recall that the proposed gen-tie lines would be mounted approximately 120 feet above the ground and the proposed lightning masts and dead-end support structures, which are not depicted in Figure 6b, would not exceed 115 feet tall.

{¶ 102} Figure 8b in the report shows a simulation of the gen-tie lines from along the northbound lane of a public highway identified as KOP 4. The caption under Figure 8b states that the step-up substation would be located beyond the clustered vegetation seen in the background:



8b) View from KOP 4 with the Project simulated. At this distance, the steel monopole structures would become the prominent features in the view, extending into the skyline. The proposed step-up substation would be located beyond the clustered vegetation. The connection from the Project gen-tie to the step-up substation would depend on substation design and is not shown here.

{¶ 103} The caption further explains that the connection from the gen-tie lines to the step-up substation is not depicted, because that connection would depend on the substation's ultimate design. However, based on the record evidence, no component of the substation would exceed the height of the gen-tie-line poles that are depicted in Figure 8b. And because the components of the step-up substation would be beyond the tree line shown in Figure 8b, they would be minimally visible, if visible at all, from KOP 4.

{¶ 104} The local governments argue that the proposed project's substations are "intrusive[] . . . looming structures." But even the tallest components of the substations are no taller than the gen-tie line shown in Figure 6b, which is barely visible. And the step-up substation components would appear just beyond the tree line shown in the background in Figure 8b—hardly as looming as the gen-tie lines simulated in the foreground of that figure. The local

governments have not explained how these simulations would change if the missing substation components were included in the depiction. The local governments are not entitled to reversal of the board's orders, even if under its own rules the board should have required Oak Run to submit additional depictions of the project area. *See S. Branch Solar*, 2025-Ohio-5679, at ¶ 33, quoting *In re Application of Ohio Power Co.*, 2018-Ohio-4698, ¶ 50 ("This court 'will not reverse a [board] order based on speculation.'" [Bracketed text in original.]).

### III. The board's orders should be affirmed

**{¶ 105}** Oak Run is not required to ensure that the proposed project is completely shielded from neighbors' or the public's view. *See id.* at ¶ 43 (finding that the applicant was "not required to ensure that the solar panels [of its project] would be invisible or completely screened off from a neighbor's property"). The board had adequate depictions and explanations of the facilities that would be built as part of the project to properly determine that the visual impacts of the project would be minimal.

**{¶ 106}** The record shows that most of the substation components would be shielded from view by vegetation and therefore would not be visible even in a photographic simulation or pictorial sketch. And the local governments have not offered any evidence to show how the substation components might actually appear in any photographic simulations or pictorial sketches to establish that the board's determination would have been different but for the omitted components.

**{¶ 107}** The board is entitled to make reasonable inferences so long as the record contains probative evidence to support those inferences, *see S. Branch Solar*, 2025-Ohio-5679, at ¶ 18, and such evidence is present here. This court's remand is an unnecessary act of micromanagement that has the appearance of oversensitivity to local political concerns and that ignores the record evidence on which the board plainly based its decision. Because the board's decision was adequately supported by the record, *see id.*, this court should affirm the board's

orders granting a certificate of environmental compatibility and public need to Oak Run. I therefore cannot join Part II(B) of the lead opinion. I thus concur in part in and dissent in part from the court's judgment and would affirm the board's orders.

_____

**HAWKINS, J., joined by KENNEDY, C.J., and SHANAHAN, J., concurring in part and dissenting in part.**

{¶ 108} The lead opinion today concludes that this case must be remanded to appellee, the Ohio Power Siting Board, for further proceedings because intervening appellee, Oak Run Solar Project, L.L.C., failed to provide adequate visual simulations or sketches of its proposed project from public vantage points when it submitted its application for a certificate to construct a major utility facility. *See* lead opinion, ¶ 2. With that I agree. I also agree with the lead opinion's conclusion that Oak Run has otherwise taken steps to minimize the adverse visual impacts of the project, *see id.* at ¶ 16-22.

{¶ 109} I cannot, however, join in the lead opinion's conclusion that even though Oak Run failed to satisfy the water-quality-study and wildlife-survey requirements of the Ohio Administrative Code when it submitted its application to the board, appellants, the Board of Trustees for Somerford Township, the Board of Trustees for Deercreek Township, the Board of Trustees for Monroe Township, and the Madison County Board of Commissioners (collectively, "the local governments"), have failed to show that they have been prejudiced by that failure. Moreover, I disagree with the lead opinion's conclusion that the board has accounted for safety concerns related to the on-site battery-energy storage system ("BESS") and the lead opinion's conclusion that the board did not shift to the local governments the burden that Oak Run was required by statute to satisfy. Accordingly, I concur in part in and dissent in part from the court's judgment.

{¶ 110} Under R.C. 4906.10(A), the board is prohibited from "grant[ing] a certificate for the construction, operation, and maintenance of a major utility

facility" unless it finds that all the factors enumerated in R.C. 4906.10(A)(1) through (8) have been satisfied. Similarly, the applicant must submit an application that "conform[s] to the requirements of Chapters 4906-4 through 4906-6 of the Administrative Code." Former Adm.Code 4906-2-04(B), 2015-2016 Ohio Monthly Record 2-1859 (effective Dec. 11, 2015). The law places the burden on the applicant to show that it has satisfied the statutory and administrative-rule requirements. *See* R.C. 4906.06(A). The lead opinion today accepts that Oak Run has failed to carry this burden. *See* lead opinion at ¶ 34, 45, 49. I agree.

{¶ 111} But the lead opinion then concludes that the local governments have not shown that they have been prejudiced by the board's decision to approve Oak Run's application—an application that does not satisfy the requirements set forth in the Administrative Code. *See id.* at ¶ 2. To be sure, our case law recognizes that this court will not reverse the board's order "unless the party seeking reversal shows that it has been or will be harmed or prejudiced by the order," *In re Complaint of Buckeye Energy Brokers, Inc. v. Palmer Energy Co.*, 2014-Ohio-1532, ¶ 19. That is, the appellant—here, the local governments—must show that it has been or will be "meaningfully affected" by the error, *In re Application of Champaign Wind, L.L.C.*, 2016-Ohio-1513, ¶ 15.

*Water-quality studies*

{¶ 112} Former Adm.Code 4906-4-07(C)(1)(d) required Oak Run to demonstrate the water-quality baseline of any receiving stream by providing "at least one year of monitoring data, using appropriate Ohio environmental protection agency reporting requirements." 2015-2016 Ohio Monthly Record 2-1886, 2-1887 (effective Dec. 11, 2015). Former Adm.Code 4906-4-07(C)(2)(b), in turn, required Oak Run to "[p]rovide an estimate of the quality and quantity of aquatic discharges from the site clearing and construction operations." *Id*. Though the lead opinion recognizes that Oak Run failed to satisfy former Adm.Code 4906-4-07(C)(1)(d)'s requirements, *see* lead opinion at ¶ 34, it dismisses the local governments' concerns

about the proposed project's impact on local water quality as speculative, and it analogizes this case to this court's decision in *In re Application of Harvey Solar I, L.L.C.*, 2025-Ohio-1503, *see* lead opinion at ¶ 39.

**{¶ 113}** In *Harvey Solar*, this court held that an applicant's failure to comply with the water-quality provisions of the Administrative Code when seeking a construction certificate was excusable because the applicant indicated in its application that "its project [would] not generate any water-related discharges or wastewater" and the project's opponents "did not submit any evidence to prove otherwise." *Harvey Solar* at ¶ 49; *see also In re Application of Alamo Solar I, L.L.C.*, 2023-Ohio-3778, ¶ 63 (failure to comply with water-quality provisions of Administrative Code deemed excusable because applicant averred that "the projects [would] not create any water-related discharges or wastewater and there [would] be no streams receiving runoff").

**{¶ 114}** In my view, though, the local governments have shown that water-related discharges will occur with Oak Run's proposed project, and they have shown that they will be meaningfully affected by the absence of baseline water-quality measurements. The Oak Run project calls for the grading of approximately 500 acres of agricultural land. A senior development engineer for Oak Run testified that the construction work can carry eroded soil into nearby streams, and Oak Run explicitly noted in its application that while no point-source water discharges are likely to occur, stormwater discharges are expected. Other evidence shows that most of the project area drains immediately downstream into the Big Darby Creek watershed and that that watershed is at risk of losing many of its indigenous species if excess soil makes its way into the water. Perhaps in view of this probability, Oak Run stated in its application its intent to create a stormwater-pollution-prevention plan ("SWPPP") to mitigate stormwater discharges. Without the rule-required water-quality measurements that should have been submitted by Oak Run with its application, however, the local governments will be unable, except at taxpayer cost,

to gauge the efficacy of the SWPPP and discern whether Oak Run's construction activities are harmful to the community's downstream water supply. Indeed, the lead opinion acknowledges that "knowing the preexisting water quality of nearby steams is necessary to determine" the impact of the project on nearby water sources. *See* lead opinion at ¶ 35.

{¶ 115} It is simply wishful thinking—in favor of the party with the statutory burden—to conclude that despite anticipated stormwater discharges from 500 acres of graded land, the local governments can point to no evidence that meaningful runoff will occur. *See id.* If Oak Run believed that water-quality measurements were irrelevant to its proposed project and therefore did not need to be submitted with its application for a construction certificate, it was required to request advance permission from the board to omit that information from its application. *See* former Adm.Code 4906-4-01(B), 2015-2016 Ohio Monthly Record 2-1882, 2-1883 (effective Dec. 11, 2015). It neither requested nor obtained that permission, and the local governments are now left in the dark about the potential harm the project may pose to local water sources and the wildlife that use those sources. Those failures by Oak Run meaningfully affect the local governments.

{¶ 116} I also fail to see how the lead opinion can find that the local governments have been prejudiced by Oak Run's failure to provide the requisite photographic simulations with its application, *see* lead opinion at ¶ 31, but not make the same finding regarding the absence of baseline water-quality studies. The lead opinion today reverses the board's decision with regard to the local governments' second proposition of law. *Id.* That reversal is warranted, the lead opinion explains, because Oak Run failed to satisfy the requirements of former Adm.Code 4906-4-08(D)(4)(e), 2017-2018 Ohio Monthly Record 2-998, 2-3002 (effective Apr. 26, 2018), so the board was unable to make an informed decision about the visual impacts of the proposed project. *See* lead opinion at ¶ 31. That reasoning is

conspicuously absent from the lead opinion's analysis of the remaining propositions of law. If Oak Run's failure to satisfy the requirements of former Adm.Code 4906-4-08(D)(4)(e) prevented the board from making an informed decision about the visual impacts of the project, then so too did Oak Run's failure to satisfy the requirements of former Adm.Code 4906-4-07(C)(1)(d) and (C)(2)(b) prevent the board from making an informed decision about the project's potential effects on local water quality.

*Wildlife surveys*

{¶ 117} Former Adm.Code 4906-4-08(B)(1)(c) required Oak Run to "[p]rovide the results of a literature survey of the plant and animal life within at least one-fourth mile of the project area boundary," including both plant and animal species that are "designated as endangered or threatened," as well as plant and animal species that "are of commercial or recreational value." 2017-2018 Ohio Monthly Record at 2-3000. In line with the lead opinion, I refer to endangered or threatened species as listed species and to species of commercial or recreational value as nonlisted or unlisted species. *See* lead opinion at ¶ 44-45. Former Adm.Code 4906-4-08(B)(1)(d) then required Oak Run to "[c]onduct and provide the results of field surveys of the plant and animal species identified in the literature survey." 2017-2018 Ohio Monthly Record at 2-3000.

{¶ 118} The lead opinion believes that even though Oak Run never performed a literature survey for nonlisted animals, Oak Run nevertheless provided the information required by the administrative rule because "other information in the record touches on the project's potential effects on unlisted species," lead opinion at ¶ 45. It points to the testimony of an environmental consultant for Oak Run who testified that the proposed project was "not anticipated to result in impacts to non-listed wildlife."

{¶ 119} That flimsy statement cannot carry Oak Run's burden. I fail to see how Oak Run could say that the proposed project would not impact unlisted

wildlife, given that it never studied what types of unlisted wildlife could be present within a quarter mile of the project's boundary. Moreover, it is clear that the testimony presented by Oak Run's consultant is based on conjecture alone and is limited to narrow circumstances involving only certain aquatic birds and flightless mammals. That is concerning, given that the literature survey that Oak Run *did* conduct identified numerous species of bats, fish, and mussels—all animals outside the scope of the witness's speculative testimony. That literature survey identified 25 listed species within the project area. It appears exceedingly likely, then, that the number of nonlisted species within the project area would far exceed 25. Indeed, testimony before the board highlighted the presence of red-tailed hawks, deer, coyotes, skunks, and racoons in the area surrounding the property. The lead opinion and the board's rote deference to Oak Run on this aspect of Oak Run's application precludes any serious inquiry into the potential impacts the project would have on nonlisted wildlife—an inquiry that is required under former Adm.Code 4906-4-08(B)(1)(c).

{¶ 120} Worse still is the lead opinion's treatment of Oak Run's field survey. Though the literature survey identified 25 listed species of birds, fish, bats, and mussels in the proposed project area, Oak Run's field survey consisted of a search for only endangered or threatened bat species. That means that Oak Run surveyed only *four* out of the 25 species identified in the literature survey and that it did not survey any of the nonlisted species since it failed to research any nonlisted animal species in the project's boundary area. The lead opinion again concludes, though, that this is fine because Oak Run's environmental consultant testified that the project was not expected to result in significant impacts to nonlisted wildlife. *See* lead opinion at ¶ 49. The law, however, required Oak Run to conduct and provide with its application the results of literature and field surveys, not mere speculation about whether the project was anticipated to impact nonlisted animals. The local governments, meanwhile, will be unable—without themselves

conducting the studies that Oak Run was required by law to conduct—to gauge the impact that the 6,050-acre facility will have on local wildlife. That, too, meaningfully affects the local governments.

{¶ 121} I also must reiterate that the reasoning that the lead opinion employs in its analysis of the local governments' second proposition of law applies here. So if, as the lead opinion concludes, Oak Run's failure to satisfy the requirements of former Adm.Code 4906-4-08(D)(4)(e) prevented the board from making an informed decision regarding the visual impacts of the proposed project, then Oak Run's failure to satisfy the requirements of former Adm.Code 4906-4-08(B)(1)(c) and 4906-4-08(B)(1)(d) likewise prevented the board from making an informed decision about the potential impacts the project would have on local wildlife. In an effort to excuse its inconsistent application of the Administrative Code, the lead opinion assumes that "there would likely be minimal impact on local water quality and plants and wildlife with construction of the project," lead opinion at ¶ 52. Without the rule-required baseline information, however, I view this fragile claim as little more than a tenuous assumption.

*Battery-energy storage systems*

{¶ 122} Oak Run will house a BESS consisting of 328 large battery containers on approximately 11 acres of the proposed project site. The BESS is expected to use lithium-ion-battery technology, which poses a significant threat to the environment in the event of a fire. Evidence before the board showed that if the BESS catches fire, it cannot be extinguished; it must instead burn continuously until its fuel source is spent. To protect the surrounding area during a lithium-ion-battery fire, firefighters must set up a defensive perimeter around the fire and use water to prevent it from spreading. While a lithium-ion-battery fire burns, though, it releases hydrogen-fluoride gas into the atmosphere, which—when combined with ambient moisture—becomes hydrofluoric acid, a highly corrosive liquid and contact poison. A witness for Oak Run highlighted multiple instances of lithium-

ion-battery fires involving the Tesla Megapack, which is the battery tentatively selected for use in the BESS.

{¶ 123} In its application, Oak Run did not present a plan to address the risks posed by the BESS. It instead promised to provide an emergency-response plan to the board at some later date, and it claimed that it would comply with certain fire codes, inquire with local firefighters about the availability of water supplies, and provide firefighting equipment and training to those local firefighters. The board approved Oak Run's application on the condition that Oak Run follow through with these promises. *See* 2024 WL 1465954, *55, 74, 82 (Mar. 21, 2024). The lead opinion today acknowledges that no developed fire-safety plans are in place for the proposed project, but it concludes that reversal of the board's decision approving Oak Run's application for a construction certificate is unwarranted on this issue because the board can monitor Oak Run's compliance with the imposed fire-safety conditions throughout the construction process. *See* lead opinion at ¶ 64. This, in my view, is a mistake.

{¶ 124} To be sure, this court has recognized "that the board is not required to resolve every issue before issuing a [construction] certificate," *Harvey Solar*, 2025-Ohio-1503, at ¶ 24; *see also Alamo Solar*, 2023-Ohio-3778, at ¶ 41. But I find application of that general practice to be a poor fit in this particular case. Unlike our recent invocation of that practice in the adverse-visual-impact context in *Harvey Solar* and *Alamo Solar*, *see Harvey Solar* at ¶ 18-25; *Alamo Solar* at ¶ 36-41, the BESS in this case poses an immediate threat to the health and safety of members of the local communities. Oak Run's plans to address the risks, however, are speculative at best. Oak Run acknowledges that it has not identified a water source capable of containing the spread of an 11-acre lithium-ion-battery fire. Oak Run's promises also contain no indication that the public would be protected from the chemicals that would be released into the environment during a battery fire. The toxic chemicals released during such fires are known to cause gastrointestinal,

cardiovascular, endocrine, and neurological diseases. Moreover, there is no indication that the local firefighters (to whom the inflated fire-fighting responsibilities will now fall) would be capable—even with equipment and training provided by Oak Run—of containing such a colossal fire. Until the fire-safety plans are more fully developed, the local governments will be unable to determine whether their communities will be safe from the potential harm of a battery fire.

{¶ 125} Environmental harms, once caused, are less easily mended than fences and shrubs. We should not allow the board to avoid its responsibility of resolving this particular issue in this case. *See In re Application of Buckeye Wind, L.L.C.*, 2012-Ohio-878, ¶ 53 (Lundberg Stratton, J., dissenting) ("Issues are not to be settled *after* construction is approved, much less by unaccountable staff members without public scrutiny or judicial review." [Emphasis in original.]).

*Burden shifting*

{¶ 126} The aforementioned defects in Oak Run's application share in common an absence of meaningful oversight from the board. To obtain approval of its application, Oak Run was required to submit a complete application to the chairperson of the board. *See* R.C. 4906.06(A). Oak Run did not do that. The chairperson was then required to examine the application to determine whether it complied with Chapters 4906-1 to 4906-7 of the Administrative Code, and within 60 days of receipt, he or she was required to reject the application if it was incomplete. Former Adm.Code 4906-3-06(A), 2015-2016 Ohio Monthly Record 2-1877 (effective Dec. 11, 2015). The chairperson did not do that. Instead, the chairperson accepted Oak Run's "application as complete," former Adm.Code 4906-3-06(A)(1), 2015-2016 Ohio Monthly Record at 2-1877, and forwarded the application to the board's staff for review—though not without indicating that staff "[could] request additional information to ensure [s]taff [could] continue to conduct its review of the application." The local governments filed with the board a motion for an order directing Oak Run to supplement its application with the missing

information, but their request was flatly denied by an administrative-law judge. In affirming that administrative-law judge's holding, the board noted that the local governments "had an opportunity to request" the missing information "during discovery" and that the local governments could have raised their concerns "with expert witnesses during the evidentiary hearing," 2024 WL 1465954 at *37.

{¶ 127} Expecting the local governments to obtain by discovery and expert-witness testimony the information that Oak Run was required *by statute* to include in its application amounts to burden shifting. We must give effect to the words of a statute, *see, e.g.*, *State v. Beatty*, 2024-Ohio-5684, ¶ 8, and the statute here places the burden on Oak Run to submit a complete application, *see* R.C. 4906.06(A); *see also* former Adm.Code 4906-2-04(B), 2015-2016 Ohio Monthly Record at 2-1859. The lead opinion's assertion that the local governments "have not identified a guiding principle to assist us in determining when an administrative agency has flipped the burden of proof from an applicant to an intervenor," lead opinion at ¶ 72, rings hollow given the burden-setting mandates of the Revised Code and the Administrative Code. Moreover, it would be impossible for the local governments to obtain the missing information in discovery because that information—water-quality studies, wildlife surveys, and a developed fire-safety plan—do not exist until they are obtained by Oak Run. Nor could the local governments be expected to obtain the missing information by conducting the research themselves because Oak Run is the only party with access to the proposed project site to perform the studies that the law requires.

{¶ 128} As explained above, we have recognized that "the board is not required to resolve every issue before issuing a [construction] certificate," *Harvey Solar*, 2025-Ohio-1503, at ¶ 24; *see also Alamo Solar*, 2023-Ohio-3778, at ¶ 41. This court has invoked this reasoning, though, in connection with R.C. 4906.10(A), which allows the board to conditionally approve an otherwise incomplete application, thus allowing an applicant to "flesh out the details" of some aspects of

a project "as the construction process evolves," *Alamo Solar* at ¶ 41. But there is no indication here that the board conditioned its approval of Oak Run's application on Oak Run's eventual compliance with the water-quality-study and wildlife-survey provisions of the Administrative Code. Moreover, as explained above, I find the application of this practice to be a poor fit in this particular case.

{¶ 129} Oak Run is in the best position to understand the environmental harm that its proposed project poses to the local communities, which is why Ohio law places the burden on Oak Run to submit an application that satisfies the requirements of the Administrative Code. Expecting the local governments, at taxpayer expense, to obtain the information that Oak Run was supposed to provide with its application is the wrong precedent to set.

*Conclusion*

{¶ 130} There is no disputing the fact that Ohio's energy needs are growing by the day. The General Assembly has authorized the construction of commercial solar farms as one way to address these needs and has given the board the authority under R.C. 4906.10 to approve or disapprove applications for the construction of such facilities—an often unenviable task given the frequent objections of local residents who reside near a particular project area. Though local residents have no power to "veto" the board's approval of an application for a certificate to construct a large-scale major utility facility, they have the right to ask questions of the board to ensure their safety and quality of life are not compromised. And they have the right to expect that the board will follow the law when deciding whether to approve an application, particularly when a project as large and unprecedented as Oak Run's is being considered for construction in their backyard.

{¶ 131} Here, in its quest to build the nation's largest and first-of-its-kind utility-scale solar "agrivoltaics" program in Madison County, Oak Run submitted an application that the board—both when the application was filed and throughout these proceedings—acknowledged was incomplete under the Administrative Code.

Oak Run's "we'll get that information to you later" approach, and the board's acquiescence to it, might be understandable when it comes to the number of trees that will be planted or what color the facility will be painted.

{¶ 132} But when the local governments ask, "Will our water be polluted?" or "Will local wildlife be destroyed?" or "Will our properties be safe from fire?" the board's response amounts to either "We'll figure that out later" or "Oak Run promises it'll be ok." These answers not only ignore the requirements set forth in the Administrative Code, they dismiss the real concerns of the local governments and leave the citizens of Madison County to question whether such concerns would have been left unanswered had Oak Run proposed such a project in Columbus.

{¶ 133} Though I concur in the court's judgment remanding this case to the Power Siting Board for additional proceedings, I would also order Oak Run to supplement its application with the missing information before the board conducts a new hearing. Accordingly, I concur in part and dissent in part.

_____

Van Kley Law, L.L.C., and Jack A. Van Kley, for appellants.

Dave Yost, Ohio Attorney General, and John Jones and Ambrosia E. Wilson, Assistant Attorneys General, for appellee.

Dickinson Wright, P.L.L.C., Christine M.T. Pirik, Jonathan R. Secrest, David A. Lockshaw Jr., Terrence O'Donnell, and Matthew C. McDonnell, for intervening appellee.

Hubay Dougherty and Trent Dougherty; and Sabin Center for Climate Change Law, Columbia Law School, and Matthew Eisenson, urging affirmance for amicus curiae Dr. John Boeckl.

Chris Tavenor and Karin Nordstrom, urging affirmance for amicus curiae Ohio Environmental Council.

Flannery Georgalis, L.L.C., W. Benjamin Reese, and Matthew L. Jalandoni, urging affirmance for amici curiae Ohio Chamber of Commerce and Ohio Business Roundtable.

_____